WALTER LANGDON, Respondent, *v.* THE MAYOR, ALDERMEN, AND COMMONALTY OF THE CITY OF NEW YORK, Appellant.

The rule that public grants shall be construed most strongly in favor of the public and against the grantee, and that nothing passes under such a grant by implication, does not apply, at least to its full extent, to a grant made upon adequate valuable consideration, but is applicable to gratuitous grants made by the sovereign upon the solicitation of the grantees.

A grant of the right of wharfage, at a wharf adjoining land under water belonging to the grantor, carries with it, as a necessary incident and appurtenance, and as part of the grant, a right of way or access to the wharf for vessels over such adjacent lands.

The State has succeeded to all the rights of both the crown and parliament of England in the navigable waters within its limits, and in the soil under them; it holds them as absolute owner, and, except as restrained by constitutional limitations, its right to grant them is absolute and uncontrollable.

Where valid grants are once made by the State, the property granted can only be resumed by it when needed for the public use under the right of eminent domain, upon making compensation.

Prior to the year 1807 the city of New York had caused West street to be laid out and constructed upon lands under water in the Hudson river, granted to it by the Montgomerie charter, the westerly line of which was designed to be the outer line of wharves or bulk-heads, "a permanent line" west of which no grants should be made or buildings erected. In 1807 the commissioners of the land office, under authority of a statute of that year (Chap. 115, Laws of 1807), granted to the city a strip of land under water in said river, north of the north line of the land granted by said charter, the westerly line of which is four hundred feet west of low-water mark. The city laid out an extension of West street along said strip, the westerly line of the street being about two hundred feet west of low-water mark. In 1810 the city granted to A., the owner of the adjoining uplands, certain lands under water, including a portion of said strip, the westerly bounds of the grant being "the permanent line of West street," "saving and reserving * * * so much of the same as will be necessary to make * * * West street" in accordance with the map or plan. In consideration of the grant the grantee covenanted to pay certain perpetual rents, to make such good, sufficient and firm wharves as should be necessary to make the portion of West street, within the bounds of the grant, of the width specified, and to forever thereafter maintain and keep them in repair. The city covenanted that the grantee should "at all times" thereafter "have, use and enjoy * * * all and all manner of wharfage, benefits and advantages growing, accruing or arising;

| | |
|---|---|
| 93 | 129 |
| 110 | 575 |
| 110 | 582 |
| 93 | 129 |
| 111 | 43 |
| 93 | 129 |
| 112 | 280 |
| 112 | 399 |
| 112 | 400 |
| 93 | 129 |
| 114 | 430 |
| 93 | 129 |
| 116 | 387 |
| 93 | 129 |
| 117 | 61 |
| 93 | 129 |
| 125 | 390 |
| 93 | 129 |
| 126 | 37 |
| 127 | 280 |
| 93 | 129 |
| 133 | 629 |
| 93 | 129 |
| 135 | 262 |
| 93 | 129 |
| 143 | 30 |
| 93 | 129 |
| 144 | 85 |
| 144 | 407 |

by or from the wharf or wharves to be erected on the west end of the premises " granted. A. constructed West street across the land granted, in accordance with his covenant, and thereafter kept in order and maintained the wharf or bulk-head which formed the westerly line of said street. Under the act of 1870 (Chap. 137, Laws of 1870, § 99, as amended by chap. 574, Laws of 1871, § 6) ; the city adopted a new plan for the water-front along said river, under and by which a new exterior wharf or bulk-head line was laid down in front of the premises so granted, one hundred and seventy-five feet west of the westerly line of West street ; and, without making compensation to plaintiff, who succeeded to the title of A., it erected a bulk-head on such line and filled up the space between it and the old bulk-head, thus destroying its use as a wharf. In an action to recover damages, etc., *held,* that the city acquired by its grant from the State the right to fill up the lands granted ; to build wharves thereon, and to receive wharfage ; that whatever property rights it thus acquired it could convey to individuals ; that by its grant to A. the city conveyed not only the land, excepting the part covered by West street, but also the right of wharfage ; that an easement *i. e.* a perpetual right of free access to the wharf erected by A. over the land of the city under water adjacent thereto, also passed by necessary implication ; that the city had the right to grant such an easement; that the legislature could not, and by the act in question, did not, attempt to authorize a destruction or impairment of this easement without compensation to the owner; and that, therefore, the action was maintainable.

*Furman* v. *Mayor, etc.* (5 Sandf. Sup. Ct. 16), affirmed, 10 N. Y. 567.
*Whitney* v. *Mayor, etc.* (6 Abb. N. C. 329), distinguished.

(Argued April 20, 1883; decided October 2, 1883.)

APPEAL from order of the General Term of the Supreme Court, in the first judicial department, made October 27, 1882, which reversed a judgment in favor of defendant, entered upon a decision of the court on trial at Special Term, and granted a new trial. (Reported below, 28 Hun, 158.)

This action was brought to recover damages alleged to have been sustained by plaintiff by reason of the erection of a new wharf or bulk-head in front of plaintiff's wharf upon the Hudson river, and the filling in of the intervening space, thus cutting off access by vessels to plaintiff's wharf The material facts are stated in the opinion.

*James C. Carter* for appellant. As the proprietor of the riparian upland, Astor had no estate in, or easement upon, the

land below high-water mark. The sovereign, as the owner of the land under water, could raise it above the surface, and improve it as he might think fit, without any just complaint on the part of Astor. The rights of the latter, and his heirs, are derived from the deeds alone. (*Lansing* v. *Smith*, 4 Wend. 9; *Gould* v. *H. R. R. Co.*, 6 N. Y. 522; *People* v. *Tibbets*, 19 id. 523; *Furman* v. *The Mayor*, 10 id. 567; *Yates* v. *City of Milwaukee*, 10 Wall. 504; *Barney* v. *Keokuk*, 94 U. S. 324.) The city of New York, under its various grants of land under water, had a clear power to extend the *ripa* or shore in front of Astor, out to a line anywhere within four hundred feet beyond low-water mark. (*Commonwealth* v. *Alger*, 7 Cush. 53; Dongan Charter, §§ 3, 14; 1 Bliss, Olney and Whitney's Laws, 6, 14, 50, 52; Montgomerie Charter, §§ 37, 38.) The legislature of the State, from which the city derived all the title and authority which it possessed in or over the land acquired under the act of April 3, 1807, could not itself empower the city to create the easement or servitude insisted upon by the respondent. (Sedgwick on Stat. and Const. Law, 153; Dwarris' Statutory Construction, 479.) Nor can it be successfully argued that the alienation of West street and the incumbering of the title to the lands beyond it, in the manner claimed by the respondent, would not utterly preclude the city from the discharge of the obligation imposed upon it. (*Whitney* v. *The Mayor*, 6 Abb. N. C. 327.) The language of the deeds to Astor confers upon the grantee all the wharfage which might at any time thereafter be earned at the wharf, to be erected upon the premises, but does not impart a perpetual guaranty that the structure shall forever remain a wharf, or that the city will never do any thing to abridge the duration of the power to collect wharfage. (*Mayor of Alleghany* v. *O. & P. R. R. Co.*, 26 Penn. St. 355, 360; *Monongahela Nav. Co.* v. *Coons*, 6 W. & S. 101, 113; *Hagan* v. *Campbell*, 8 Porter [Ala.], 925; *Townsend* v. *Brown*, 4 Zabr. 80, 87; *Stevens* v. *P. & N. R. R. Co.*, 34 N. J. 532, 534; *Charles River Bridge* v. *Bridge*, 11 Peters, 420, 544–9; *D. & P. R. R. Co.* v. *Litchfield*, 23 How. [C. C.] 66, 88; *Gildart* v. *Gladstone*, 1

East, 675; *Story* v. *N. Y. El. R. R. Co.*, 2 Abb. N. C. 479, 495; *Fertilizing Co.* v. *Hyde Park*, 97 U. S. 659, 666; *Newton* v. *Comm'rs*, 100 id. 561; *Binghamton Bridge*, 3 Wall. 575; *Mills* v. *St. Clair Co.*, 8 How. [U. S.] 579; *Perrine* v. *Canal Co.*, 9 id. 177; *Butler* v. *Pennsylvania*, 10 id. 414; *R. R. Co.* v. *R. R. Co.*, 13 id. 78; *B'k of Ohio* v. *Knoof*, 16 id. 376; *R. R. Co.* v. *U. S.*, 92 U. S. 741.) All grants of money or property by a State to one of its municipalities, to be administered by it as a subordinate governmental agency, still remain within the absolute control of the State. Such grants are not contracts within the meaning of that provision of the Federal Constitution which preserves the obligation of contracts. (Angell & Ames on Corporations, §§ 30–36; *Dartmouth College* v. *Woodward*, 4 Wheat. 636; *Trustees of the University* v. *Winston*, 9 Ala. 17.) The city had no power to create the easement in question. (*Whitney* v. *Mayor, etc.*, 6 Abb. N. C. 327; *Furman* v. *Mayor, etc.*, 5 Sandf. S. C. 16; 10 N. Y. 567, 569.) The authority to acquire property or easements given to the dock department by the act of 1871 (Chap. 574) is limited to property or easements not owned by the city. To gather from this, the legislative determination of a judicial question, namely, that the right to fill up in front of the Astor grant does not belong to the city, is inadmissible under the broadest latitude of construction. (*Susquehanna Canal Co.* v. *Wright*, 9 W. & S. 9; *Monongahela Nav. Co.* v. *Coons*, 6 id. 101.) The clause in these deeds " saving and reserving " so much of the lands within the description as would be necessary to make Washington and West streets of the specified width has all the qualities of an exception, and none of those which characterize a reservation merely. (The Touchstone, 77; 4 Cruise's Digest, 271, 272; *Borst* v. *Emple*, 5 N. Y. 33; *Boreel* v. *Mayor, etc.*, 2 Sandf. 552.)

*Samuel E. Lyon* and *Charles F. Southmayd* for respondent. Under the common law no particular technical words are necessary to constitute a valid grant, but any words

sufficiently indicating the intention of the parties to such ef-
fect will operate as a grant. (4 Cruise's Digest, 112, tit. 32,
Deed, chap. 6, §§ 35, 39, 40; *Holmes* v. *Sellers*, 3 Levinz,
305; 4 Kent's Com. 491; *Boreel* v. *The Mayor*, 2 Sandf.
552, 556, 557, 558; 68 N. Y. 552.) The grant of the right of
wharfage at a wharf adjoining land under water belonging to
the grantor carries with it, as a necessary incident and in legal
effect as a part of the grant, a right of way or access to the
wharf for vessels, over the grantor's adjacent land under water.
(3 Kent's Com. 421; Co. Litt. 56 *a; Charles River Bridge*
v. *Warren Bridge*, 11 Pet. 617; *Lord Darcy* v. *Askwith*,
Hobart, 234; *Pomfret* v. *Ricroft*, 1 Saund. with Williams'
Notes, 323, *n.* 6; id. n. *l; Voorhees* v. *Burchard*, 55 N. Y.
98; *Huttemeier* v. *Albro*, 18 id. 48.) The grant of the wharf-
age right in question was made by the city merely in its char-
acter of proprietor, and to carry out a bargain and sale for pe-
cuniary consideration, and is not a public grant. (*Brick
Presbyterian Church* v. *Mayor, etc.*, 5 Cow. 528, 540.) If
the rules of law which have been laid down in relation to the
construction of "public grants" were to be applied to the
construction of this grant and covenant, the right of the
plaintiff to have the grantor's land under water adjoining
the wharf remain open and unobstructed, so as to admit access
to the wharf by vessels, and enable him to take and enjoy the
wharfage conveyed by the grant, and the quiet enjoyment of
which was assured by the covenant, would still remain clear.
(*Charles River Bridge* v. *Warren Bridge*, 11 Peters, 420, 545,
548, 557; 7 Pick. 462, 469; *Lansing* v. *Smith*, 4 Wend.
8, 22, 23; 8 Cow. 146, 148.) The rights of private wharf or
wharfage proprietors in New York city are not in general
held merely as temporary rights, subject to abrogation, with-
out compensation, by new improvements made by the city upon
the water front. (*Marshall* v. *Guion*, 11 N. Y. 460, 476;
*Van Zandt* v. *Mayor, etc.*, 8 Bosw. 375; *Yates* v. *City of
Milwaukee*, 10 Wall. 497.) Besides the assurance of per-
petuity of tenure and enjoyment which was deducible from
the language of the grant and covenant, there was in exist-

ence when Astor received his grant in 1810, a statute, passed after the act of 1798, which shows clearly how the legislature regarded and felt itself bound to treat the rights of individual proprietors who had received grants or made investments under the permanent plan established by the act of 1798. (Act of April 2, 1806; Davies' Laws, city of New York, 422–3.) Upon the extension of the wharf or bulk-head line further into the river, by the operation performed by the defendant here, the remedy of the private proprietor is for pecuniary compensation. (*Marshall* v. *Guion*, 11 N. Y. 460.)

EARL, J.   Under the Dongan charter, in 1686, the crown of England granted to the city of New York all the land between high and low-water mark around the island of Manhattan, with jurisdiction over the same, and with power " to take in, fill, and make up and lay out all and singular the lands and grounds in and about said city and island Manhattan, and the same to build upon, or make use of in any other manner or way as to them shall seem fit, as far into the rivers thereof and that encompass the same as low-water mark aforesaid;" and in 1730, by the Montgomerie charter, it further granted a strip of land four hundred feet in width, lying immediately outside of low-water mark, and extending from Corlear's Hook, on 'the East river, around the southern extremity of the island to Bestaver's rivulet (excepting, however, the space in front of the Battery), with full power and authority at any time thereafter " to fill, make up, wharf, and lay out all and every part thereof," and to take the wharfage, cranage and dockage arising or accruing therefrom.   It was, however, provided in the grant that nothing therein contained should empower or entitle the city to wharf out before any persons who had prior wharf grants beyond low-water mark, without the actual agreement or consent of such persons, and that of the wharves to be built or run out by the city, there should be left toward the East and North rivers, forty feet broad for the convenience of trade and the planting of batteries in case of necessity.

Under these charters, the city at an early day made many

grants, to private persons, of lands under water, with the right to make wharves and take the wharfage accruing therefrom, and such grants extended out into the rivers to unequal distances within the limits of ownership by the city.

In 1796 the common council of the city passed the following ordinance : " The street committee reported to the board a description from an actual survey made of an outer street along the west side of the city, which is to be of the breadth of seventy feet, and beyond which no grants ought to be made and no buildings erected, which was read and approved by the board."

In 1798 the common council presented a petition to the legislature, in which they represented that as well for the ornament and improvement of the city, as for the enlargement of the trade and commerce of the State, and the safety of the shipping at the wharves of the city, they had lately " directed a permanent street, seventy feet wide, to be laid out and completed at and on the extremity of their grants already made, and hereafter to be made, to individuals on the East river, called South street, and on the North river, called West street, south and west of which streets, no buildings of any description" were to be permitted to be erected; that by reason of the curving, and otherwise irregular state of the shore at low-water mark in the two rivers, at the time of the making of the grants by their predecessors, a general map of which, if ever made, could not then be found, such grants were deemed to extend to unequal distances into both rivers, which occasioned difficulties in making the two permanent streets regular; that in many instances, although they were willing gratuitously to give the soil under water, on which the two streets, seventy feet wide, were to be made, yet doubts were entertained whether they could compel any of the proprietors of the lots fronting on such streets and who might be willing, to make those streets for public use in any given reasonable time to be appointed by the common council; that part of their plan was to extend piers at right angles from those " permanent streets" into the rivers, but that doubts had also arisen whether they could compel the in-

dividual proprietors of the wharves to sink and lay out such piers, or, if they should refuse, whether they would be authorized to sink and build the piers at the expense of the city, and receive the wharfage, without incurring a breach of the conditions and covenants contained in their grants to individuals; that some adequate remedy was essentially necessary in the premises, as well to secure the health of the citizens as to effect ornament and regularity in the fronts of the city, and convenience and safety to the trade and commerce thereof; and they prayed that the legislature would confer such power and authority upon them as would be proper to remove the difficulties and doubts stated, or make such provision as to the legislature should seem meet.

In compliance with this petition, in the same year, the legislature passed an act under which West street was laid out, in the preamble of which the substance of the petition was recited as the reason for the enactment. The first section provided that it should be lawful for the city to lay out, according to such plans as it should adopt, such streets or wharves as were mentioned in the preamble, in front of those parts of the city which adjoin the two rivers, and of such extent along those rivers as it might determine; and that as the buildings of the city should be further extended along the rivers, it should be lawful for it from time to time to lengthen and extend such streets and wharves. Section 2 provided that such streets and wharves should be made and completed according to the plan thus to be adopted, at the expense of the proprietors of land adjoining or nearest and opposite to such streets or wharves, in proportion to the breadth of their several lots, by certain days to be for that purpose appointed by the city, and that the respective proprietors of such of the lots as might not be adjoining to such streets or wharves should also fill up and level, at their own expense, according to such plan, the spaces lying between their several lots and the streets and wharves, and should, upon so filling up and leveling the same, be respectively entitled to, and become the owners of, such intermediate spaces of ground in fee-simple. Sections 3 and 4 provided that if any of the

proprietors should neglect or refuse to fill up and level such intermediate spaces of ground, the city could do it on their behalf and charge them with the expense and collect the expense of them. Section 5 provided that it should be lawful for the city to direct piers to be sunk and completed at such distances and in such manner as it should deem proper, in front of the streets and wharves, to be made at the expense of the proprietors of the lots lying opposite to the places where such piers should be directed to be sunk, and if such proprietors should neglect or refuse to sink or make such piers according to the directions of the city, it should be lawful for the city to sink and make them at its own expense, and to receive to its own use wharfage for all vessels that might at any time lie at, or be fastened to, such piers; and section 7 provided as follows: "That no building of any kind or description whatsoever (other than the said piers and bridges) shall at any time hereafter be erected upon the said streets or wharves, or between them respectively, and the rivers to which they respectively shall front and adjoin."

By an act passed April 2, 1806 (Chap. 126 of that year), the legislature authorized the city to construct additional slips and basins, and to take to itself the wharfage from them, the first section of which contains the following provision: "Provided always that nothing herein contained shall be construed to deprive any person who may have made piers by the direction of the said mayor, aldermen and commonalty, in pursuance of an act entitled 'An act for regulating the buildings, streets, wharves and slips in the city of New York,' of any legal right which they may have thereby acquired, or to interfere with any private property, or right, or privilege held under grants of the said mayor, aldermen and commonalty, or otherwise;" and in the third section it was provided that "in case any of the persons who, according to the said above-mentioned act, shall have been directed to sink or complete piers and bridges in the said city, have neglected or shall neglect to comply with such directions, it shall be lawful for the said mayor, aldermen and commonalty to

grant the right of making such piers and bridges, and the right of receiving the profits thereof, to any person or persons, in fee or otherwise, upon such terms as they shall think proper." On the 3d day of April, 1807, the legislature passed an act (Chap. 115) the fifteenth section of which empowered and directed the commissioners of the land office to grant by letters-patent to the city of New York all the right and title of the people of the State to the lands covered with water along the easterly shore of the North river, contiguous to and adjoining lands of the city at and from low-water mark, and running four hundred feet into the river from Bestaver's kill (the northerly end of the grant by the Montgomerie charter) to the distance of four miles to the north along the easterly shore of the river; and also all the land covered with water along the westerly shore of the East river, contiguous to and adjoining the lands of the city at and from low-water mark, and extending four hundred feet into the river from the north side of Corlear's Hook (the northerly end of the grant by the Montgomerie charter on that side of the city) to the distance of two miles to the north along the westerly shore of the East river; and the section contained a provision that the proprietors of the adjacent lands should have the pre-emptive right in all grants made by the city, of any lands under water granted to the city under that act.

Thereafter, in December, 1807, the commissioners of the land office, by letters-patent duly issued by them, granted to the city all the right and title of the people of the State to the lands covered by water along the North and East rivers, as designated and described in, and authorized by the act last referred to.

On the 1st day of August, 1810, John Jacob Astor was the owner and proprietor of certain lands above high-water mark, and on that day the city, by a deed properly executed on its behalf, granted to him, his heirs and assigns, the adjacent water lots and land under water, designated as two parcels, the last of which was described as follows: " Beginning at a point in the northerly line of King street, ninety-eight feet westerly

from the north-westerly corner of the intersection of King and
Greenwich streets aforesaid, at high-water mark; thence
westerly along the said northerly line of King street, four
hundred and twenty-eight feet to the permanent line of West
street; thence southerly along said permanent line about one
hundred and fifty feet to the line of land under water, granted
by the party of the first part to William Bruce; thence easterly
along said Bruce's line, and parallel to King street aforesaid,
four hundred and fifteen feet six inches, to high-water mark;
thence southerly along high-water mark, as it winds and turns,
to the place of beginning, saving and reserving, nevertheless,
out of the water lots and soil under water above mentioned, so
much of the same as will be necessary to make Washington
street sixty feet wide, and West street seventy feet wide, the
said streets to be extended and continued through the premises
aforesaid, as the same shall be directed by the said parties of
the first part, and agreeably to a map or plan of the premises
made by John S. Hunn, city surveyor, which is hereunto an-
nexed, together with all and singular the profits, advantages,
emoluments, hereditaments and appurtenances unto the said
water lots and soil under water and premises belonging or in
any wise appertaining." The grant was made in considera-
tion of the covenants and agreements contained in the deed,
which the party of the second part was to keep and perform.
He was to pay for the granted premises as rent, $147.50
annually until May 1, 1838, and forever thereafter annually
$200.60. He was within three months next after he was
requested by the city, at his own expense, to make and
complete such good, sufficient, and firm wharves and   reets
as should be necessary to make Washington street sixty feet
wide, and West street seventy feet wide so far as these
streets were within the granted premises. He was also to
build a wharf and street for the westerly extension of King
street into the river below high-water mark; and he, his
heirs and assigns were forever, at their own expense, to
pave, uphold and keep in good order the wharves and streets
thus to be made, and the wharves and streets were thereafter

forever to be and remain public streets or highways for free
and common use, in like manner as the other public streets or
wharves of the city.    The deed contained mutual covenants
for the construction of a pier into the river at the foot of King
street, at the joint expense and for the mutual benefit of the
parties.    On behalf of the city there was a covenant that the
party of the second part, his heirs and assigns, should at all
times thereafter peaceably and quietly hold, use, occupy, possess
and enjoy the granted premises with the appurtenances, with-
out any let, suit, trouble, denial or eviction, or of or by the city
or any other party, and that the party of the second part, his
heirs and assigns should and might lawfully " at all times "
thereafter " fully and freely have, use and enjoy to his and
their own use, all and all manner of wharfage, benefits and ad-
vantages growing, accruing or arising by or from the wharf
or wharves to be erected on the west end of the premises, being
of the width of one hundred and fifty feet ; " and lastly it was
covenanted and agreed and declared to be the true intent and
meaning of the parties, as follows :  . " That this present grant,
or any words or any thing herein contained, shall not be deemed,
construed or taken to be a covenant or covenants on the part
and behalf of the said parties of the first part or their succes-
sors, but only so as to pass the estate, right, title and interest
they have, or lawfully may claim by virtue of their several
charters."

The premises granted by this deed were a portion of those
granted to the city by the commissioners of the land office in
December, 1807, as above stated, and the westerly line of
West street, which the plaintiff claims bounds the premises
granted to Astor on the west, was about two hundred feet
easterly of the westerly boundary of the four hundred feet
granted to the city by such commissioners ; and thus the city
still retained land under water outside of the land granted to
Astor, two hundred feet in width.        .

Annexed to the deed to Astor was the map referred to
therein, which at the top thereof contained the following lan-
guage :   " Map of ground partly under water, on both sides of

King street, between Greenwich street and the permanent line, showing the grant made by the corporation of New York to John Jacob Astor, and the reservation for a public basin." West, Washington and King streets, the pier at the foot of King street, and the lands granted are laid down upon the map and described; and the westerly line of West street is described as the "permanent line," bounding the Hudson river on the east.

Astor in his life-time constructed West street in conformity to the covenant contained in the deed to him. That street, from the southerly end thereof to a point about two hundred and twenty feet southerly of King street, was laid out under the city ordinance passed in 1796, which is above set out; and it was laid out through the lands granted to Astor by the city under a resolution adopted by the common council in January, 1828.

Astor and his successors in title have fully performed all the money covenants contained in the deed to him, and have kept in repair and maintained the wharf which formed the outer or westerly line of West street. The plaintiff derived title to the premises, rights, and privileges granted to Astor, under and through the will of Astor, and he and his predecessors in the title have, ever since the grant to Astor and the construction of the wharf (until the acts complained of in this action), been in the quiet and uninterrupted possession and enjoyment of the wharf, and of the emoluments, rents, wharfage, and privileges arising therefrom.

By the act chapter 137 of the Laws of 1870, as amended by chapter 574 of the Laws of 1871, a department of docks was created, the head of which was to be a board consisting of five persons residing in the city of New York, to be appointed by the mayor, and to possess such powers and perform such duties as should be established and defined by the commissioners of the sinking fund of the city. That department was to have exclusive charge and control (subject in some particulars to the commissioners of the sinking fund) of all the wharf property belonging to the city, including all the

wharves, piers, bulk-heads, and structures thereon, and waters adjacent thereto, and all the slips, basins, docks, water-fronts, land under water and structures thereon, with the appurtenances which were then owned or possessed by the city, or to which the city was or might become entitled under the provisions of that act, or otherwise; and it was to have the exclusive charge and control of the repairing, building, maintaining, leasing and protecting such property, and the exclusive government and regulation of all wharves, piers, bulkheads, and the structures thereon and waters adjacent thereto, and all the basins, slips and docks, with the land under water within the city, not owned by the city. That department was also to prepare and, subject to the approval of the commissioners of the sinking fund, adopt a plan for the water-fronts of the city, which was to be the sole plan according to which any wharf, pier, bulk-head, basin, dock or slip, with the structures thereon, could thereafter be laid out or constructed, and the sole plan and authority for solid filling in waters surrounding the city, and for extending piers into such waters. It was also authorized by purchase or process of law, as provided in the act, to acquire in the name and for the benefit of the city, any and all wharf property to which the city then had no right or title, and any rights, terms, easements and privileges pertaining to any wharf property not owned by the city. After the adoption of the plan for the improvement of the water-fronts of the city it was to proceed, according to such plan, to lay out, establish and construct wharves, piers, bulkheads, basins, docks or slips, in and upon, or about the property owned by the city, "without interfering with the property or rights of any other person, except so far as may be necessary to insure the safety and stability of the wharves, piers, bulk-heads, basins or slips so to be constructed."

Under these acts of the legislature, such proceedings were had and taken that a new plan for an exterior wharf and bulk-head line was adopted by the department of docks, by which the new bulk-head or exterior line was laid down to be built one hundred and seventy-five feet westerly from the westerly

·side of West street.  Before the commencement of this action, without making any compensation to the plaintiff for his wharf and wharfage rights, the dock department proceeded to erect and construct a bulk-head on such new bulk-head exterior line, and commenced to fill in the land under water between the old bulk-head and the new bulk-head, and thus prevented the access of vessels to the old bulk-head; and since the commencement of this action it has completed the building of the new bulk-head and filled up with solid filling the space between the old bulk-head and the new one, thus entirely destroying the old bulk-head as a wharf.

This action was brought by the plaintiff to recover damages for interference with his wharf and wharfage rights, and to restrain the further prosecution of the work by the dock department, his claim being that that department could not lawfully destroy his wharfage rights without making compensation to him therefor under the act of 1871; and whether it could or not is the question now to be determined.

The city took the fee to the land under water granted to it by the Dongan and Montgomerie charters, and the right to build wharves and docks thereon, and to take and have the wharfage accruing therefrom.  It could grant the lands to individuals with all the rights and privileges which it possessed; and it did, in fact, prior to 1798, make many such grants.

Under the act of April 3, 1798, as well as under acts prior thereto, general authority was conferred upon the city to lay out and construct wharves, and the general system seems to have been for the city to convey the land under water to individuals, requiring them to fill up the land and construct the wharves, with the right to receive the wharfage, which system was repeatedly recognized by the legislature.

The fifteenth section of the act passed April 3, 1807, contains this preamble, showing the purpose for which it was enacted: " And whereas, for the purpose of duly regulating and constructing slips and basins, and for running out wharves and piers, it is essential that the right to the land under water, below low-water mark, should be vested in the corporation of

the city of New York;" and to accomplish the purpose thus indicated, the act authorized the commissioners of the land office to grant to the city, forever, the land under water described in the act. While the land was to be granted to the city to enable it to regulate and construct wharves, etc., the final clause of the section recognized the right and power of the city to grant the lands to individuals to accomplish the purpose intended, by giving the pre-emptive right to the proprietors of the adjacent uplands.

Under the two charters, and the course of legislation referred to, we have no doubt that the city acquired all the title to the land granted, which the crown of England or the State could convey, and that it also acquired all the rights to fill up such lands, and build wharves thereon, and receive the wharfage therefor, which the sovereign authority could give it.

A grant of land by the sovereign, bounded by tide water, limits the land conveyed to high-water mark, and gives the grantee no private or exclusive rights whatever below that. (*Gould* v. *Hudson River R. R.*, 6 N. Y. 522.) In such case the grant is exclusively a conveyance of dry land, and is to be construed without reference to the water, just as if it were bounded on all sides by dry land. But when the sovereign grants land under water, which cannot, in its natural state, be subjected to any of the uses to which dry land may be devoted, then a different rule of construction must be applied to the grant, so as to make it effectual for some purpose. Such a grant may be made to give an exclusive right of fishery, or of navigation, or to enable the grantee to fill up the land for wharves and docks, or other buildings. The purpose may be plainly expressed in the grant; if it be not, then the intent of the parties must be ascertained from the nature and situation of the land granted, and all the circumstances surrounding the grant which may properly be considered for the purpose of ascertaining such intent. Here, taking the language of the charters and grants, the course of legislation, and all the statutes in *pari materia*, the situation of the lands granted and

the use to which many portions of them had, with the knowl-
edge and consent of the legislature, been from time to time
devoted, it is very clear that the lands under water around the
city were conveyed to it in fee, to enable it to fill them up as
the interest of the city might require, and to regulate and
control the wharves and wharfage.

We think it equally clear that whatever title and property
rights the city thus obtained, it could transfer and convey to
individuals. Having the power to extend the *ripa* around the
city, and thus make dry land, it could authorize any individual
to do it. Whatever wharves and docks it could build, it could
authorize individuals to build, and whatever wharfage it could
take, it could authorize individuals to take. Its dominion over
the lands under water, certainly for the purposes indicated in the
preamble contained in section 15 above cited, was complete.

The learned counsel for the appellants, for the construction
of the grant by the city to Astor, invokes the rule generally ap-
plicable to the construction of public grants, that such grants are
to be construed most favorably to the public, and most strongly
against the grantee ; that nothing shall pass by such grants ex-
cept what is expressed in unequivocal language, and that what-
ever is not unequivocally granted is deemed to be withheld,
nothing passing by implication. That rule of construction has
been applied to gratuitous grants made by the sovereign, of
property, franchises and privileges, upon the solicitation of the
grantees, and such were the grants in all the cases cited in the
appellants' brief. But so far as I have discovered, this rule has
never been applied, certainly not in its full extent, to grants
made for the benefit of the sovereign, upon adequate valuable
consideration paid to the sovereign for the thing granted. In
2 Blackstone's Commentaries, 347, it is said: "A grant
made by the king, *at the suit of the grantee,* shall be taken
most beneficially *for* the king, and *against* the party ; whereas
the grant of a subject is construed most strongly *against the
grantor.* Wherefore it is usual to insert in the king's grants
that they are made, not at the suit of the grantee, but *ex spe-
ciali gratia, certi scientia, et mero motu regis :* and then they

have a more liberal construction." The reason generally given for the rule is that in a grant proceeding from the application of the subject, the grantee ought to know what he asks, and if that does not appear, nothing shall pass from the king by reason of the uncertainty. In *Charles River Bridge* v. *Warren Bridge* (7 Pick. 344, 462), MARTIN, J., speaking of public grants, said: "Although no distinct thing or right will pass by implication, yet I do not mean to question that the words used should be construed in their most natural and obvious sense, and that whatever is essential to the enjoyment of the thing granted will be necessarily implied in the grant." Again: "The authority to build the bridge is granted by implication. But it is a necessary implication. Without it the grant itself would be an absurdity and nullity." In the same case, WILDE, J., said that in doubtful cases it seemed to him "a sound and wholesome rule of construction to interpret public grants most favorably to the public interest, and that they are not to be enlarged by doubtful implication;" but he said: "There are some legislative grants no doubt that may admit a different rule of construction, such as grants of land on valuable consideration and the like. It is that, when the king's grants are upon a valuable consideration, they shall be construed favorably to the patentee for the honor of the king. (Bac. Abr., Prerog. F. 2.)" In the same case, in the United States Supreme Court (reported in 11 Peters, 420), TANEY, C. J., approved the general rule above referred to for the construction of public grants, and at page 549, speaking of the charter there under consideration, said: "In charters of this description no rights are taken from the public, or given to the corporation, beyond those which the words of the charter, by their natural and proper construction, purport to convey. There are no words which import such a contract as the plaintiffs in error contend for." At page 557, McLEAN, J., said: "In ordinary cases a grant is construed favorably to the grantee and against the grantor. But it is contended that in governmental grants nothing is taken by implication. The broad rule thus laid down cannot be sustained by authority.

If an office be granted by name, all the immunities of that office are taken by implication. Whatever is essential to the enjoyment of the thing granted must be taken by implication. And this rule holds good whether the grant emanates from the royal prerogative of the king of England, or under an act of legislation in this country. The general rule is that 'a grant of the king at the suit of the grantee is to be construed most beneficially for the king, and most strictly against the grantee;' but grants obtained as matter of special favor of the king, or on consideration, are more liberally construed;" and to the same effect are the observations of STORY, J., at page 589, where he says the rule never did apply to grants made by the sovereign for a valuable consideration. In 3 Washburn on Real Property (3d ed.), 172, the learned author says: " This strictness of construction in favor of the sovereign and against the subject applies only in cases where there is a real uncertainty or ambiguity in the terms of the grant. Nor, as it seems, is the rule applicable where the grant is for a valuable consideration. In such case the rule of construction between the government and the subject is the same as between private grantors and grantees." In *Boardman* v. *Reed* (6 Pet. 328), it was held that the entire description of the lands given in a patent must be taken together, and the identity of the land ascertained by a reasonable construction of the language used; but if there be a repugnant call, which by the other calls of the patent clearly appears to have been made through mistake, that does not make the patent void ; that to explain an ambiguity or doubt which arises from a certain call in the patent, the call may be explained either by showing that it was made through mistake, or that under the circumstances which existed at the time of the survey of the land patented, it was not inconsistent with the other calls of the patent; that the meaning of the parties to a patent for land must be ascertained, like that of all written instruments, by the terms of the whole patent, and not by looking at a part of it, and that if a latent ambiguity arise from the language used, it may be explained by parol. In *McIver* v. *Walker* (9 Cranch, 173, and again in

4 Wheaton, 444), where a patent under a grant by North Carolina, referred to a plat annexed, and in such plat a water-course was laid down as running through the land, it was held that the tract must be surveyed so as to include the water-course and to conform as near as may be to the plat, although the lines thus run did not correspond with the courses and distances given in the patent, and the patent did not call for the water-course.    In *Brink* v. *Richtmyer* (14 Johns. 255), where an island, commonly called and known by the name of Green Flats, was granted by patent, the grant was held good although the Green Flats were usually covered with water and, therefore, not strictly an island, there being no other land answering the description.    In *Colvin* v. *Burnet* (2 Hill, 620), it was held that a grant of lands by the State did not authorize the grantee to erect a dam thereon so as to flow adjoining lands, unless that right be expressly provided for in the grant; but COWEN, J., writing the opinion of the court, said that if the dam had been on the premises at the time of the grant, then the right to flow the adjoining land would have passed as an incident to the grant.

We have thus sufficiently referred to authorities as to the rule for the construction of public grants.    It will be seen that the common-law rule is recognized in this country, which requires that all grants by the sovereign of exclusive privileges and franchises, and all gratuitous grants of land should be strictly construed against the grantee; but that the same strict rule of construction should not be applied to grants of land made for a valuable and adequate consideration paid or agreed to be paid by the grantee.    The Federal·government annually makes numerous grants of lands for value paid, and so do some of the States and cities, and it would be quite absurd and perhaps alarming to apply to such grants, usually made by intelligent public officers, with deliberation, in language carefully chosen, under the advice of counsel, the strict rule of construction which at common law was applied to the grants of the English sovereigns.    The rule had its origin in the desire to protect the sovereign against imposition, and to preserve the

royal prerogatives against grasping and insatiate courtiers.    In this country it has usually been applied to grants of charters, franchises and privileges made by legislative acts; and to such cases, where the acts are prepared by the grantees and expressed usually in their language, the passage of the acts being solicited by them primarily, if not exclusively, for their own benefit, there can be no objection to its rigid application. Even at common law it was the rule so to construe public grants, if they could be, as to uphold them, as it was not to be supposed that the sovereign would do a vain and futile thing, and the aim of the courts was to ascertain and, if possible, give effect to the intention of the parties.

Now, here, what did the city by its grant to Astor intend to convey, and what did he, for the consideration which he covenanted to give, expect to receive?

It is conceded that the deed to Astor vested in him the absolute fee to the land granted, and that he could fill up the land under water and thus become the owner of the dry land. While the description by metes and bounds carried the grant to the exterior west line of West street, the lands within the limits of that street and of Washington street were, we think, excepted from the grant by the language, " saving and reserving out of the several water lots and soil under water above mentioned, so much of the same as will be necessary to make Washington street sixty feet wide, and West street seventy feet wide."    What was saved, or (meaning the same thing here) excepted, was not easements for the streets, but the soil upon which they were to be constructed, and the design probably was to vest the title to the land in those streets in the city the same as it was then the custom to vest in the city the title to all the lands taken by it for streets.

Astor covenanted to build the wharves and streets, and forever to maintain them and keep them in repair, and they were to continue and remain forever public streets or highways.    If there were nothing more than the grant of the land really to the inner or easterly side of West street, and the covenant of Astor to build and maintain the wharf upon the

land of the city, the arguments for the maintenance of this action would be less forcible than they now are. But there is more. The city not only conveyed the land adjacent to West street to Astor, the owner of the highland, binding him to build and maintain the wharf, but covenanted that he, his heirs and assigns should "at all times" thereafter "fully and freely have, use and enjoy to his and their own use, all and all manner of wharfage, benefits, and advantages growing, accruing or arising by or from the wharf or wharves to be erected on the west side of the premises," and then there was a mutual covenant that nothing contained in the grant should be deemed, construed, or taken to be a covenant or covenants on the part of the city, except so far as to pass the estate, right, title and interest which the city had or might lawfully claim by virtue of its several charters. The latter mutual covenant did not utterly nullify the former covenant, but left it to operate as to any estate, right, title and interest which the city then had in the granted premises. As the city then had all the interest, every thing which it attempted to convey to Astor, its covenant must operate at least so far as to prevent it from impairing, interfering with, or destroying any interest which it granted. But without determining that the plaintiff could maintain this action, resting entirely upon the covenant of the city as a covenant, we are of the opinion that the language used must operate as a grant of the wharfage. The right of wharfage is an incorporeal hereditament, of which the proper mode of convey-ance by the common law was a grant; and in respect of grants the rule is well settled that no particular, technical words are necessary to constitute a valid grant; but that any words sufficiently indicating the intention of the parties will operate as such. In 4 Cruise's Digest (112, title 32, Deed, chap. 6, §§ 39, 40), it is said : "The proper and technical words of a grant are *dedi et concessi*, given and granted, but any other words that show the intention of the parties will have the same effect. A. entered into an article with B. by which he agreed that in consideration of a certain rent, B. should have a way for him-self and his heirs over certain lands of A. This was held to

be a good grant of a right of way, and not merely a covenant for enjoyment. (*Holmes* v. *Sellers*, 3 Levinz, 305.)" Whatever easement or other incorporeal interest in land one covenants and agrees that another shall forever have and enjoy, he by the use of such language grants and conveys just as effectually as if the word "grant" was used. The plaintiff's right to wharfage, an incorporeal interest in real estate, may then be treated as lying in grant and not merely in covenant. (*Boreel* v. *Mayor, etc.*, 2 Sandf. Sup. Ct. 552; *Smith* v. *Mayor, etc.*, 68 N. Y. 552.)

A wharf is a structure, on the margin of navigable waters, alongside of which vessels can be brought for the sake of being conveniently loaded or unloaded, and wharfage is the fee paid for tying vessels to a wharf, or for loading goods on a wharf or shipping them therefrom. Hence, water of sufficient depth to float vessels is an essential part of every wharf, a necessary incident thereof, or appurtenance thereto, without which there can be no wharf and no wharfage. Indeed, a wharf cannot be defined or conceived except in connection with adjacent navigable water. Hence it is claimed on the part of the plaintiff that by the legal effect of the grant to Astor, the land under water, outside of the wharf or the line of West street, then owned by the city, became servient to the right of wharfage granted to Astor; that the land under water was, by force of the grant, devoted to the purpose of floating vessels which might resort to the wharf, and that the defendants could not lawfully put the land under water in front of the wharf to any use which would prevent access to the wharf, or destroy the right of wharfage, without making compensation for the injury thus inflicted.

The legal proposition, that the grant of the right of wharfage at a wharf adjoining land under water belonging to the grantor, carries with it, as a necessary incident and appurtenance, and in legal effect as part of the grant, a right of way, or access to the wharf for vessels over the grantor's adjacent land under water, has the support of legal principles, which, it is believed, have never been disputed. In 3 Kent's

Comm. 421, it is laid down as a general rule "that when the use of a thing is granted, every thing is granted by which the grantee may have and enjoy such use." In the *Charles River Bridge Case*, Judge STORY, at page 592, said that "it is a principle of common sense, as well as of law, that where a thing is granted, whatever is necessary to its enjoyment is granted also." In Coke on Littleton (p. 56*a*), it is said: "He who grants a thing, grants impliedly all that is necessary to the enjoyment of that thing, and this principle extends to grants made by the law." In 2 Washburn on Real Property (3d ed.), 278, it is said: "An easement may be created or reserved by an implied grant, when its existence is necessary to the enjoyment of that which is expressly granted or reserved, upon the principle that when one grants any thing to another, he thereby grants him the means of enjoying it, whether expressed or not."

An easement for access to the wharf over the adjacent land of the city under water passed by necessary implication. Without the easement the wharf would be of no use, there could be no wharfage, and the grant as to the wharf and wharfage would be futile. The grant was made for an adequate valuable consideration. It was not made solely or primarily for the benefit of the grantee, but primarily for the benefit of the city in pursuance of a policy for improving its harbor and furnishing its treasury. Under such circumstances there is no rule of construction which can confine the grant to the metes and bounds mentioned in the deed. If the city had owned this wharf and granted it, the right to wharfage and an easement for access to the wharf over the adjacent land of the city under water would have passed by necessary implication as incidents and appurtenances of the thing granted. (*Smith* v. *Mayor, etc.*, 68 N. Y. 552, 557; *Doane* v. *Broad Street Association*, 6 Mass. 332.) So it would seem that a grant of the right to build and forever maintain a wharf upon the land of the city, would upon the same principle carry with it the right to take the wharfage and have access to the wharf. In addition to the right to build and maintain the wharf, however, here there was

on the part of the city an express grant of the wharfage, and it must have been the intention of the parties that the grantee should have open water in front of his wharf for the accommodation of vessels that the wharfage which was granted to him might be earned.

The easement was co-extensive in time with the right to maintain the wharf and to take the wharfage. The deed to Astor imposed obligations and conferred rights, and they were correlative and perpetual. By the language of the deed, the grantee, his heirs and assigns were to have the land granted forever. They were forever to pay the stipulated rent, and forever to maintain the wharf and the streets, and they were forever to remain public streets and highways. There were covenants on the part of the city that upon performance of his covenants by the grantee, he should " at all times " thereafter have and possess the granted premises with the appurtenances, and " at all times " thereafter have the wharfage accruing at the wharf. In the deed the westerly line of West street, upon which the wharf was to be built, was described as a permanent line, and in two other deeds executed at the same time, the westerly line of West street was described as " commonly called the permanent line." On the maps annexed to these three deeds, West street was laid down and the exterior line thereof was described as " the permanent line." By the city ordinance of February 10, 1796, above recited, it was provided that no grants ought to be made, and no buildings erected beyond the outer street, subsequently called West street. In the petition of the common council presented to the legislature in 1798, above referred to, West street is spoken of as a permanent street on the outer limits of the city, beyond which there were to be no buildings of any description. In the act of the legislature of 1798, also above referred to, provision was made for the construction of West street and the wharf thereon, and in the seventh section it was provided that no building of any kind or description should at any time thereafter be erected outside or in front of West street. Taking all these circumstances into consideration, it is clear that the parties intended, what the language of the deed

naturally and obviously imports, a perpetual grant of wharfage, with a perpetual right of free access to the wharf over the adjacent water. They were contracting in reference to what was then believed to be the permanent water-line of the city on the North river; in reference also to a permanent wharf which the grantee was bound forever to maintain. He could not maintain a wharf properly speaking without water in front thereof for floating vessels. He was to receive his remuneration for building and maintaining the wharf, by the wharfage which he expected to receive, and he was to pay the stipulated rent forever. It is inconceivable that the parties did not intend that the wharfage and all its incidents were to be enjoyed forever. The wharf was to be built on the permanent line established by the city, recognized in the statute, and mentioned in the deed and the map, and then it was to be maintained forever. Nothing was to be built in front of it so as to interrupt its use. There is no rule of construction, however strict or narrow, which will limit the grantee's right of wharfage merely to a period during which the city will permit the wharf to exist, thus making the right of wharfage granted, in language importing perpetuity, depend upon the will and pleasure of the city, a mere revocable license.

But the further and more important claim is made upon behalf of the appellants, which may be briefly stated thus: The *jus publicum* in and over navigable waters of ports and harbors is vested in the State in trust, and for the benefit of the whole people; the trust is continuing and may and must be performed from time to time by each legislature as the public exigencies may demand; one legislature cannot preclude its successors from their performance of the trust; the creation of an easement over the land under water, in front of the wharf, does effectually preclude any discharge of this governmental duty or trust, so long as such easement continues; under its charters and the acts referred to the duty was imposed upon the city to perform the same trust, subject to the same limitations, and, therefore, the city, under the authority of the legislature, could at any time, in the performance of such trust, extend the shore

line in front of plaintiff's land and fill up the land in front of his wharf, without any invasion of his rights under the grant to Astor; and the further claim is made that the grant must be so construed under the rule of construction invoked, as to give the city such authority.  We thus are presented with a question of legislative power, important in the principles involved in its solution, and in the vast pecuniary interests depending.

From the earliest times in England the law has vested the title to, and the control over, the navigable waters therein, in the crown and Parliament.  A distinction was taken between the mere ownership of the soil under water and the control over it for public purposes.  The ownership of the soil, analogous to the ownership of dry land, was regarded as *jus privatum*, and was vested in the crown.  But the right to use and control both the land and water was deemed a *jus publicum*, and was vested in Parliament.  The crown could convey the soil under water so as to give private rights therein, but the dominion and control over the waters, in the interest of commerce and navigation, for the benefit of all the subjects of the kingdom, could be exercised only by Parliament.  (*Commonwealth* v. *Alger*, 7 Cush. 53; *People* v. *N. Y. & S. I. F. Co.*, 68 N. Y. 71.)

In this country the State has succeeded to all the rights of both crown and Parliament in the navigable waters and the soil under them, and here the *jus privatum* and the *jus publicum* are both vested in the State.

In England, Parliament had complete and absolute control over all the navigable waters within the kingdom.  It could regulate navigation upon them, could authorize exclusive rights and privileges of navigation and fishing, could authorize weirs, causeways and dams for private use to be constructed in them, and could interrupt and absolutely destroy navigation in them.  (*Rex* v. *Montague*, 4 B. & C. 598; *Williams* v. *Wilcox*, 8 Ad. & El. 314; *People* v. *N. Y. & S. I. F. Co.*, *supra*.)  So in this country each State (subject to limitations to be found in the Federal Constitution) has the

absolute control of all the navigable waters within its limits. As said by the chancellor in *Lansing* v. *Smith* (4 Wend. 9), the State through its legislature "may exercise the same powers which previous to the Revolution could have been exercised by the king alone, or by him in conjunction with Parliament, subject only to those restrictions which have been imposed by the Constitution of the State and the United States." In *Stevens* v. *Paterson and Newark R. R. Co.* (34 N. J. L. 532; 3 Am. Rep. 269), BEASLEY, C. J., said, that "a legislative permission to appropriate to individual use a part of the *jus publicum* does not *per se* deprive the public of a right to resume the privilege granted, unless it appears that it was the intention to vest such privilege irrevocably in the licensee;" that "the principle seems universally conceded that, unless in certain particulars protected by the Federal Constitution, the public right in navigable rivers can, to any extent, be modified or absolutely destroyed by statute." The legislature of this State, except as restrained by constitutional inhibitions, could authorize a boom to be placed for private use across the Hudson river, or grant its exclusive use to individuals, and it could grant in fee any of the inland navigable lakes wholly within this State, and its grants, thus made, would be irrevocable. (*Livingston* v. *Van Ingen*, 9 Johns. 507; *Gibbons* v. *Ogden*, 17 id. 488; *S. C.*, 9 Wheat. 1.) These powers result from its sovereignty, and the absolute control which, in consequence thereof, it has over the public domain within its limits. The right to grant the navigable waters is as absolute and uncontrollable (except as restrained by constitutional checks) as its right to grant the dry land which it owns. It holds all the public domain as absolute owner, and is in no sense a trustee thereof, except as it is organized and possesses all its property, functions and powers for the benefit of the people.

If the grant to Astor had been made directly by the legislature, or by the commissioners of the land office, under its authority, it would have been inviolable as a contract within the protection of the Federal Constitution, the obligation of which no legislative act could impair. (*Fletcher* v. *Peck*, 6 Cranch,

136.) It matters not that the grant would limit the power of the State in the exercise of its sovereignty over the public waters, and would so far limit and control future legislatures. The same is true of all grants by the State of any part of the public domain. When valid grants are once made, they are inviolable, and the property granted can be resumed by the State, when needed for public use, only upon making compensation.

It is a general rule that the legislature cannot pass an irrepealable law, but there are some exceptions. Whenever legislative acts are in substance contracts between the State and the party who is to derive some right or benefit under them, then such contracts are not the less under the protection of the Federal Constitution, because they have assumed the form of acts. The taxing power is one of the most important and essential incidents of sovereignty. Without that power the State could not raise funds to pay its expenses, and would soon perish, and yet it has been many times held by the State and Federal courts that the State can, by contract, bargain away a portion of its power to tax property and corporations by exempting them forever from taxation, and that future legislative acts cannot impair or destroy contracts thus made. (*State of New Jersey* v. *Wilson*, 7 Cranch, 164; *Jefferson Branch Bank* v. *Skelly*, 1 Black [U. S.], 436; *Farrington* v. *Tennessee*, 95 U. S. 679; *People, ex rel. Cunningham*, v. *Roper*, 35 N. Y. 629.) It is a part of the sovereign right of the State to regulate the construction of highways, bridges, ferries and railroads for the promotion of travel and commerce, and yet the legislature can, except as prohibited by Constitutions, pass an irrepealable act, granting the exclusive right to bridge a navigable stream, or to maintain a ferry over navigable water, or to build and maintain a turnpike or railroad upon a certain route. (*Charles River Bridge* v. *Warren Bridge, supra; Richmond, etc., Railroad Co.* v. *Louisa. R. R. Co.*, 13 How. [U. S.] 71; *Binghamton Bridge,* 3 Wall. 51.) So too the State exercises sovereign powers in creating corporations. They are supposed to be created to answer the public needs and to promote the

public welfare, and yet after their creation it may turn out that they are detrimental to the public interests and ought to be, therefore, destroyed, and yet no legislative act can destroy them or repeal their charters which constitute inviolable contracts, unless the right to do so was reserved at their creation. (*Trustees of Dartmouth College* v. *Woodward*, 4 Wheat. 518 ; *Planters' Bank* v. *Sharp*, 6 How. [U. S.] 301.) In all these cases it was no answer to the inviolability of the legislative contracts that one legislature could not cripple its successors in the performance of their governmental duties, or deprive them of their full legislative powers ; that the sovereignty of the State could not be thus hampered and impaired ; that these were continuing trusts, to be performed from time to time by each legislature as the public exigencies might demand, and that one legislature could not preclude its successors from their performance of such trusts. So here the grant to Astor, treating it as a grant made by the State, or under its authority, constituted an executed contract which no subsequent legislative act could either impair or destroy.

It is, however, further contended by the appellants that the city did not have the power to grant the permanent easement claimed by the plaintiff ; that the legislature had not conferred upon it the power, by creating an easement over land yet covered by water, forever to preclude either the city or State from exercising that public dominion over navigable waters which was necessary to enable it to discharge the trust of furnishing to the commerce of a great seaport those accommodations which, in the judgment of the city or the State, such commerce may, from time to time, require ; that even if the State could delegate the power to the city to grant such an easement, applying the strict rule of interpretation which they invoke for the construction of public grants, there is no language in the act of April 3, 1807, from which any power to create such an easement can be inferred ; that the control over the waterfront of the city is a public right pertaining to the sovereignty of the State, and that any surrender of it, even to a subordinate governmental agency, such as a municipal corporation, can

be proved only by the most indubitable evidence; and that the corporate authorities of the city at any particular time could not bind their successors and prevent a further extension of the water-front in the future.

These views have at least in part been answered by what has already been written. As we think we have shown, the State could have made the grant to Astor as broad as the plaintiff claims it to be. It could make the same grant to the city, and it could authorize it to make the grant to an individual. Under its old charters and the acts of 1798 and 1807, the city had the right to build wharves along its water-fronts, and to take the wharfage accruing therefrom. The land under water with the right of wharfage was property belonging to it as a proprietor, which, it is believed, the State could not take without making compensation. (Dill. on Mun. Corp. [2d ed.], § 40; Cooley's Const. Lim. [4th ed.] 292.) It is property which it could lease and sell to individuals, and which it has always been accustomed to lease and sell, and its right to do so is provided for or recognized in various acts of the legislature.

It is conceded by the learned counsel for the appellants that so far as the grant to Astor conveyed land under water, it constituted an inviolable contract, and that he could fill up the land, and that the dry land would belong absolutely to him in fee-simple. This concession, it seems to us, goes too far for the safety of his argument. If the city could vest in an individual an absolute indefeasible title to the land under water, and to the dry land to be made therefrom, why could it not vest the same title to an easement in the land under water? If the city, as a governmental agency, was simply clothed with a continuing trust, which it was bound at all times to exercise in the interests of commerce, as the exigencies calling for its exercise might, from time to time, arise, how does it happen that it has absolutely parted with all trust over the land under water and the dry land made therefrom, and yet retains the trust over the easement granted? It is conceded that the city could have granted to Astor all the land under

water in front of this upland to the outer limit of the four hundred feet granted by the State to the city in 1810. Then why could it not grant in fee two hundred feet in width, and in the interest of commerce, give an easement over the remaining two hundred feet? If it has the right to exercise the absolute dominion over the last two hundred feet, why has it not the right to exercise the same dominion over the first two hundred feet, if the exigencies of commerce demand it? Before the city conveyed to Astor it moved the *ripa* to the outer line of West street, and this it did for the improvement of the harbor. If now the city may move the *ripa* still further out regardless of the property rights of the plaintiff, why may it not move it back to its original position regardless of his property rights? If the city or the State in improving the harbor is obliged to stop at the artificial or created *ripa*, why may it not be obliged to stop at the line of the easement? If the city could forever bind itself that a portion of its land under water might be filled up, why could it not bind itself in the same way that its adjacent land under water should not be filled up? Before the grant to Astor there was nothing but land covered with water which the public could use for the purpose of navigation. If the city could so grant a portion of the land as to destroy the public use, why could it not grant an easement in the adjacent land which was entirely consistent with the public use? View the case as we will, there was the same power in the city to create the easement claimed by the plaintiff, as there was to create the interest in the dry land now claimed by him, and if the argument against him is sound, it would, we think, be impossible to maintain that the city could not, without making compensation therefor, take any of the dry land around the city which is outside of what was formerly high-water mark. We know of no principle that would protect the title to that land, that would not apply with equal force to an easement over land yet under water for the profitable and convenient use of the dry land.

But there is a still further answer to the argument we are now considering. By its grant to Astor the city divested

itself of all the rights it had to the property, rights and privileges which it purported to grant.   It granted the land under water not only, but the wharfage forever, and as we have shown, an easement for access to the wharf.   It has since acquired no new rights or interests in the land granted.   Even if the State could authorize it to destroy plaintiff's easement and wharf without compensation, it has not done so.   Under the act of 1871 the dock department had no right to take any private wharf or the easements pertaining thereto without first making compensation therefor.   This easement was a part of plaintiff's wharf property.   The city, by its grant and its covenant, was estopped from denying this, and hence that act conferred no authority to take this wharf or the easement which was a necessary appurtenance thereto without which it could have no existence.   Private rights were saved under that act, as they were under the old charters, and in the act of 1806 above referred to.

The dock department, under the act of 1871, had the undoubted power to regulate the use of plaintiff's wharf.   The legislature was competent to confer such power, and did it by that act.   A wharfinger exercises a public employment, and his business is, therefore, to some extent at least, subject to legislative control.   But the power to regulate does not include or imply a power to destroy.

The views we have expressed leave the city and the State with ample power to improve the harbor of the city in the interest of commerce.   The right of eminent domain is not impaired and has not been surrendered.   The legislature cannot surrender it, and it may be exercised whenever the public exigencies call for its exercise.   It would doubtless be less expensive for the city arbitrarily to take this easement and thus appropriate the wharfage to its own use.   But a constitutional barrier stands in the way.   It, however, imposes no burden upon the city, in requiring it to make compensation for what it takes, as it gets a dollar of value for every dollar it is obliged to pay.

Our attention has been called to the cases of *Furman* v.

*The Mayor* (5 Sandf. Sup. Ct. 16 ; affirmed, 10 N. Y. 567) and *Whitney* v. *The Mayor, etc.* (6 Abb. N. C. 329), as decisive authorities in favor of the defendants. We have carefully examined those cases, and while' there is much in the opinions bearing upon the questions involved in this case, they are distinguishable from this and do not conclude us. It would not be profitable now at the end of our opinion, already of great length, to enter into a minute criticism of the opinions in those cases. That has been ably done in the brief submitted to us by the learned counsel for the plaintiff. The cases of *Marshall* v. *Guion·* (11 N. Y. 461), and *Van Zandt* v. *The Mayor* (8 Bosw. 375) are cited on behalf of the plaintiff, and the opinions there given contain some views favorable to his contention. But they do not fully cover this case.

Thus we are brought to a conclusion adverse to the defendants. We have given the case the careful examination and consideration which the important principles involved, and the vast public and private interests to be affected, seemed to require. The subject has not been exhausted, and portions of the learned arguments submitted to us have not been touched, but we think sufficient has been written to justify the decision which we make.

The order should be affirmed, and judgment absolute ordered against the defendants, with costs.

All concur, except ANDREWS, J., absent.

Order affirmed and judgment accordingly.