WILLIAM M. KINGSLAND, AS SOLE SURVIVING TRUSTEE, ETC., OF DANIEL C. KINGSLAND, DECEASED, AND OTHERS, PLAINTIFFS, *v.* THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK, DEFENDANT.

*Grant of water lots by the city of New York — right of the city to construct new bulk-head lines — the rights of owners of lots to wharfage must be considered, and the damages sustained by them paid.*

By chapter 763 of 1857, the legislature adopted the report of the commissioners appointed by chapter 121 of 1855, establishing a permanent bulk-head line for the city of New York, in the Hudson river, and enacted that it should not be lawful to fill in with earth, stone or other solid materials in the waters beyond the said bulk-head line, or to erect any structure exterior thereto. In 1858 and 1866 the city of New York conveyed the area between the center of West Twenty-fourth street and West Twenty-fifth street, in the said city, and the said bulk-head line, to certain persons, to whose title the plaintiffs have succeeded. The deeds were each accompanied with maps, upon which the bulk-head line was designated, and the premises were conveyed as extending " to the exterior or bulk-head line of the city of New York, on the Hudson or North river," " with all and singular the premises and advantages, hereditaments and appurtenances to the same belonging, or in anywise appertaining." The grants were made for a valuable consideration, and obligated the grantees to fill in the land under water, to build and construct good and

sufficient bulk-heads, wharves and streets, and keep the same in good repair at their own expense; and to pay all taxes and assessments that might, from time to time, be imposed upon the property. The grantees, their heirs and assigns. were authorized to use and collect the wharfage, emoluments and advantages arising out of the maintenance of the wharves and bulkheads. The deeds further provided that the provisions thereof should not be construed or taken to be covenants of warranty, or of seizin, on the part of the grantors, or to operate further than to pass their title to the premises conveyed.

At the time these grants were made the city of New York had no title to the land lying under water outside of the said bulk-head. The title thereto being then vested in the People of the State of New York. Thereafter, the city, under the provisions of section 6 of chapter 574 of 1871, acquired title, from the commissioners of the land office, to a strip of land about eighty-five feet wide, lying between the old bulk-head and a new line established under the authority of the legislature, and filled in the area so conveyed to it, so as to obstruct and cut off all access by water to the lands owned by the plaintiffs, lying inside of the old bulk-head. It claimed to be entitled to do this without making any compensation to the plaintiffs for the damages they had sustained.

Held, that even if the city did not own the title to the land under water which it attempted to convey by the deeds under which the plaintiffs claim, yet, as it was clearly its intention to grant the title thereto, with the rights and privileges appertaining to or accompanying it, it would not be allowed to defeat this intent by the exercise of any rights acquired by it under the conveyance made to it by the State under the act of 1871.

That while no covenant could be implied from anything contained in the grant, yet section 2 of 2 Revised Statutes (6th ed.), page 1130, requiring every instrument creating or conveying, or authorizing the creation or conveyance of any estate or interest in lands, to be so construed as to carry into effect the intent of the parties, so far as it can be collected from the whole instrument, and section 164 of 2 Revised Statutes (6th ed.), page 1119, providing, "that every grant shall be conclusive as against the grantor, and his heirs claiming from him by descent," prevented the city from disaffirming its act and defeating the grants it had previously made.

Case submitted upon an agreed statement of facts for the determination of a controversy, without action, pursuant to section 1279 of the Code of Civil Procedure.

*Stewart & Boardman*, for the plaintiffs.

*James C. Carter* and *E. Henry Lacombe*, for the defendant.

Daniels, J. :

This controversy has arisen out of the filling in by the dock department of the city of New York of the space between the

center of West Twenty-fourth and West Twenty-fifth streets and what has been called the bulk-head line, established under chapter 763 of the Laws of 1857, and the construction of a bulk-head or wharf about eighty-five feet westerly therefrom. The area filled in, and on the outward bounds of which the wharf or bulk-head was finally constructed, was of the width of about eighty-five feet. Intermediate this bulk-head and that established in 1857 the space was filled in, thereby cutting off and destroying all access by the water to so much of the bulk-head line of 1857 as was situated between these streets.

The plaintiffs claim to have acquired title to the bulk-head line of 1857, and to the perpetual right to maintain a wharf upon that line, and to demand, collect and enjoy the wharfage and charges which might lawfully be exacted for the use of it by other parties in the course of the commercial business carried on and transacted at this part of the harbor. This claim was made under two deeds, the first of which was executed on the 4th of December, 1858, by the mayor, etc., of the city of New York to Bezaleel F. Smith, and the second of which was executed on the 26th of November, 1866, by the same grantors to William H. Guion. These deeds, so far as the descriptions are important to be considered, in form at least, conveyed to the respective grantees named therein the title to the land bounded by the centers of West Twenty-fourth and West Twenty-fifth streets, and the westerly line of Thirteenth avenue and the bulk-head line of 1857, which was the outmost limit of land then claimed to be owned by the mayor, etc., of the city of New York. On the 28th of September, 1871, the city acquired from the commissioners of the land office of the State of New York, under the authority of subdivion 10, section 6 of chapter 574 of the Laws of 1871, the title to the land westerly of the bulk-head line of 1857, extending to and beyond the line of the bulk-head or wharf afterwards erected under the authority of the dock department, and also the intermediate space filled in between these two bulk-head lines. It has been claimed on behalf of the city that this act of 1871 authorized the filling in of this intermediate space, and the erection of the wharf on the newly located bulk-head line, notwithstanding the grants to which reference has already been made. The plaintiffs in this case derived their title from the grantees in the

deeds mentioned, by means of intermediate conveyances, and by virtue of their asserted title claimed the perpetual right to have the bulk-head line, established as the westerly bounds of the premises conveyed by the deeds of the city, maintained for their benefit. While it has been insisted on behalf of the city, as it claimed no title whatever to the bed of the river beyond the bulk-head line of 1857, when these deeds were made, but the title was then in the State, that no such easement has been acquired under the deeds from the city to the use, maintenance and enjoyment of the bulk-head line of 1857, as prevented the legislative authorities of the State from changing it and placing it further to the westward in the river, and thereby terminating the use, as a wharf, of the bulk-head line of 1857, without reference to any rights claimed under the grants made by the city, and as the State possessed that right, that the city succeeded to its enjoyment by the conveyance of 1871, under the authority of chapter 574 of the Laws of that year. It has also been urged that the city, at the time when these deeds were executed and delivered, had no title to the land under the waters of the river westerly of the westerly line of the Thirteenth avenue, and that the plaintiffs, therefore, acquired no perpetual right to the maintenance of a wharf upon the westerly line of the land described in the deeds executed by the mayor, etc., of the city. These facts distinguish this case from that of *Langdon* v. *Mayor, etc.* (28 Hun, 158 ; affirmed, 93 N. Y., 129), for in that case the city owned the soil under the water which had been conveyed and that immediately beyond the extremity of the wharf or bulk-head line, and by its deed it was determined that the grantee in it and those deriving title through it, had acquired the right as against the city, perpetually to maintain the wharf erected upon the premises for their own emoluments, advantage, use and benefit. And the controlling point required to be determined in the disposition of this case, is whether the plaintiffs have derived a like right to the bulk-head or wharf erected upon the line of 1857, or whether the defendant secured the right without compensating the plaintiffs for their loss, to render this bulk-head or wharf useless and profitless by filling in the space between it and the newly adopted bulk-head line, under the authority of the act of 1871. While the case already referred to does not determine this point, it still has determined

that the deeds of the city upon which the present determination must depend, by their language secured to the grantees and their assigns a right or easement to the free and unobstructed use of the waters of the river in front of the wharves erected on the land conveyed by them. This right was appurtenant to the conveyance of the land itself, and the fact of its extreme line being bounded by the waters of a navigable river. And that it was intended the grantees in the deeds, and their assigns, should enjoy this right, and the benefits to be derived from it, has been clearly expressed in the deeds themselves. If the State, as the owner of the land westerly of the line of 1857, had, by its own act and upon its own title, filled in this intermediate space, then it may be that the plaintiffs would have had no right or claim for indemnity against the city as the grantor in the deeds through which their title has been derived. For those deeds were not so drawn as to render the city liable for the consequences of such an act performed on its own land, under the superior authority and right of the State. But whether the city could acquire this land and then by its act deprive the plaintiffs of the benefits intended to be secured by its own deeds, through which they have derived their title, is a very different question from that which would have arisen if the same work had been done directly by the State upon its own property. Whether the city could acquire the title to this land and use it as it has, to the destruction of the plaintiffs' wharf and bulk-head, must depend upon the construction which is to be given to its deeds under the laws of the State in force at the time when they were executed and delivered, and the particular law under which this work has been done.

Before either of these deeds was executed and delivered, the legislature, by chapter 121 of the Laws of 1855, provided for the selection and appointment of commissioners to locate and recommend to the legislature the position of wharves and bulk-heads " beyond which no erection or permanent obstruction of any kind should be permitted to be made," and to prepare and submit with their report maps of said harbor exhibiting the exterior lines recommended by them, and the lines of the existing piers, wharves and bulk-heads. (Subs. 3 and 5, § 1, chap. 121, Laws 1855.) This commission located and reported their line as the permanent bulk-

head line of the city, and it was described and mentioned as being the westerly line of the lands conveyed by the city. And that location was sanctioned and adopted by chapter 763 of the Laws of 1857, which provided, as to the westerly side of the city, that it should "not be lawful to fill in with earth, stone or other solid material in the waters of said port beyond the bulk-head line or line of solid filling hereby established, nor shall it be lawful to erect any structure exterior to the said bulk-head line." (Id., § 2.) The object of the two deeds made by the city was to convey the property up to this line, and they contained descriptions extended to it. And that this was intended and understood to be the final and permanent bulk-head line is clearly disclosed by the provisions contained in the acts as they have already been cited, and also by the descriptions in the two deeds. For in extending their lines westerly they are extended, in the descriptions, " to the exterior or bulk-head line of the city of New York, on the Hudson or North river," the later deed containing the additional phrase, " as now established by law." It was intended to convey the title to this line as a permanent and durable line; and in that respect the case is substantially the same as that of *Langdon* v. *Mayor, etc. (supra),* although arising under later acts of the legislature of the State.

These deeds were each accompanied with a map, to which they referred, upon which this westerly line was exhibited, and on the map annexed to the first deed the line was designated as the " bulk-head line or line of solid filling established by act of legislature passed April 17, 1857." And on the other map the location of the line was designated as the " bulk-head established April 17, 1857." And the deeds in positive terms granted these lands " with all and singular the premises and advantages hereditaments and appurtenances to the same belonging, or in any wise appertaining, to have and to hold," to the grantee, his heirs and assigns forever. These grants were each made for a valuable consideration and each also obligated the grantees, their heirs and assigns to fill in and make land out of the intermediate spaces, where the land at the time was covered by the waters of the river. And also at their own cost and charges " to build and erect make and finish or cause to be built, erected, made and finished, according to any resolution or ordinance of the said parties of the first part, their common council or their

successors already passed or adopted, or that may hereafter be passed or adopted, good and sufficient bulk-heads, wharves, streets or avenues, which shall form so much of such parts of any street or streets, avenue or avenues, that may now, or hereafter, be designated or laid out through said premises according to law as fall within the limits of the premises first above described " and which streets and avenues were excepted and reserved for the use and benefit of the public as streets and avenues of the city. The grantees, their heirs and assigns were also required at their own cost and expense to uphold and keep in good order and repair all parts of such streets and avenues as should be designated or laid through the premises conveyed. And in case of their default in doing so, then the work could be done at their expense, which if they failed to pay, or the city was unable to collect, subjected the property itself to sale for the payment of that expense. And they were also obligated to pay all taxes and assessments from time to time to be imposed upon the same property. These were the considerations upon which the grants were made and, in addition to the amount required to be paid, imposed important obligations upon the grantees, their heirs and assigns, for the benefit of the public which were deemed to be a full and fair equivalent for the property, rights and privileges described in the grants. And that it was intended and expected that the grantees, their heirs and assigns should at all times thereafter, for their own use collect the wharfage, emoluments and advantages arising out of the maintenance of the wharf or bulk-head and its use in the commercial business of the harbor excepting only the street piers, was rendered very clear by the paragraph in the deeds declaring that " the said parties of the first part for themselves their successors and assigns do covenant and agree, to and with the said party of the second part, his heirs and assigns, that he and they observing, fulfilling and keeping all and singular the articles, covenants and agreements herein mentioned on his and their part, to be kept and performed according to the true intent and meaning of these presents, shall, and lawfully may, from time to time, and at all times hereafter, fully have and enjoy, take and receive and hold to his or their own proper use, all manner of wharfage, cranage, advantages or emoluments growing or accruing by or from that part of the exterior line of the said city lying on the westerly side of the hereby granted premises

fronting on the North or Hudson river, with full power to collect and receive the same for his or their own proper use and benefit forever. Excepting such wharfage, cranage, advantages and emoluments to grow or accrue from the westerly end of the bulk-head in front of the entire width of the northerly half part of West Twenty-fourth street, which shall be and are hereby reserved for the said parties of the first part, their successors and assigns, with full power to collect and receive the same for their own proper use and benefit forever."

And it was further declared that, " it is hereby further agreed, by and between the parties to these presents, and the true intent and meaning hereof is, that the present grant and every word and thing in the same contained, shall not be construed or taken to be covenants of warranty, or of seisin of said parties of the first part, or their successors, or to operate further than to pass the estate, right, title or interests they may have or may lawfully claim in the premises hereby conveyed by virtue of their several charters and the various acts of the legislature of the State of New York." And upon this clause it is insisted that the language of the deeds shall not be so construed as to create a covenant for the quiet enjoyment on the part of the city through which it would be prevented from defeating the rights or privileges intended to be conveyed by the deeds under the succeeding grant finally made to it from the State. That this clause could not be held to have wholly superseded or abrogated the preceding general covenant, was held in *Langdon* v. *Mayor, etc.* (93 N. Y., 150), but to what extent it should be abridged in the construction of the deed was neither expressed nor intimated. But if it should be held to deprive the preceding general language of its effect as a covenant, it would still remain with the residue of the deed to be construed as a grant, indicating the intention of the grantor to have been, that the rights, advantages and privileges mentioned should be secured to the grantees, their heirs and assigns by means of the grants. And they could be no otherwise secured and obtained than by maintaining the right of the grantees, their heirs and assigns to the bulk-head line of 1857, as the final and permanent exterior line of solid filling for this part of the harbor. That the conveyances were made in this view and with this intent is abundantly sustained by their language, the reference to the line

itself, its designation on the maps annexed to the deeds and the language of the. acts of 1855 and 1857, under which this line was located and established as the exterior line of the harbor.

When these deeds were executed it was the understanding certainly that the city could lawfully convey the land under the waters of the river to this exterior bulk-head line. And the deeds were made upon the basis of that understanding. And there is no good reason for holding that this was an incorrect view to be taken of the right of the city, although its title had not by express language of the legislature been extended beyond the westerly line of Thirteenth avenue. (Laws 1826, p. 43, chap. 58, §§ 1, 2; Laws 1837, pp. 166, 167, chap. 182, §§ 1 to 3.)

For by section 2 of chapter 121 of the Laws of 1855, it was declared that "no grants of land under the waters in respect to which the said commissioners are herein required to report, shall be made by the commissioners of the land office, or of the common council of the city of New York, or by any board, officer or corporation until the further direction of the legislature in the premises." This further direction was given by the location of the exterior line of solid filling recommended by the commissioners in the enactment of chapter 763 of the Laws of 1857. And as the negative or restraint created by the act of 1855, extended only until the further direction of the legislature in the premises, and that was terminated by the act of 1857, it may be constructively implied that it was the intention of the legislature to permit the prohibited conveyances to be made after the establishment of the new line to that line, and within the limits or restrictions imposed by it. The law of 1855 carried with it such an implication, and it was no more than was conformable to the authority which had in general terms been conferred upon the city by preceding legislation, not at that time superseded or repealed. This was supplied by chapter 86 of Revised Laws of 1813, which was enacted to reduce the laws relating to the city of New York into one act. This act rendered it lawful for the mayor etc., of the city to lay out wharves and slips in the city whenever and wherever they should deem it expedient, and to acquire the title to land owned by private individuals for that purpose. It also empowered the mayor, etc., of the city to lay out, as far as that had not already been done, and according to the plan agreed upon for that purpose,

regular streets or wharves on the East river and also upon the North or Hudson river, to such an extent along those rivers as they might think proper; and as the buildings of the city extended further along the rivers, the streets and wharves themselves were authorized to be in like manner lengthened and extended: The wharves to be constructed under this authority were to be made at the expense of the owners of the adjacent lands, as those now in suit were, who were declared entitled to become the owners of the intermediate spaces of ground in fee simple. If such owners themselves failed to do the work as it might be directed, then, provision was made for its performance at their expense, and the collection of that expense from them or their property. And it was further provided that it should "be lawful for the said mayor, aldermen and commonalty to grant the right of making such piers and bridges, and the right of receiving the profits thereof, to any person or persons, in fee or otherwise, upon such terms as they shall think proper." (Id., §§ 219 to 224.)

It was, from a very early date, the policy of the legislature to authorize the construction of wharves and the filling in of the spaces between them and the land above the level of the river, by the city itself, for the benefit and advantage of its commercial business, but at the expense of the owners of the adjacent lands, who were first entitled to the conveyance of the land so filled in and made. The State at no time undertook the performance of this work or the making of these improvements, but remitted it wholly to the city and its authorities, intending at all times that the title to the bulk-heads and wharves and the land filled in should be acquired and owned by the private riparian owners. This policy was at no time abrogated or discountenanced by any act of the legislature, but the laws enacted included these purposes, and that continued to be their form to the time when the deeds in controversy were made and executed by the mayor, etc., of the city. And it may very well be held, therefore, as the intimation has been previously given, that by the Laws of 1855 and 1857 it was intended to perpetuate this policy and to confer authority upon the city to authorize the changes and improvements provided for, and to convey the title to the property immediately to the persons

owning the adjacent uplands. And that this was the understanding carried into these deeds is manifested by the further declaration and provision that if it should appear " that the said party of the second part *is* not, on the day of the date hereof, seized of a good, sure, absolute and indefeasible estate of inheritance, in fee simple, of, in and to the lands and premises on the easterly side of the premises hereby granted and adjoining the same;"    *    *    * in every such case these presents, and every article, clause or thing herein contained, shall be and become absolutely null and void; and the said parties of the first part, their successors and assigns, shall and may forthwith thereupon enter into and upon the said premises hereby granted, and shall thereafter be seized of the same, with the appurtenances, free, clear and discharged of and from all claim or right of the party of the second part, his heirs and assigns, anything herein contained to the contrary notwithstanding." And that it was not intended by chapter 574 of the Laws of 1871 to interfere with rights acquired in this manner may be inferred from the provision contained in subdivision 5 of section 6, declaring that "the said board of the department of docks shall proceed, according to said plan or plans, to lay out, establish and construct wharves, piers, bulk-heads, basins, docks or slips in the territory or district embraced in such plan or plans, and in and upon or about the property owned by the mayor, aldermen and commonalty of the city of New York, without interfering with the property or rights of any other person, except so far as may be necessary to insure the safety and stability of the wharves, piers, bulk-heads, basins or slips so to be constructed."

But even if the city did not at the time when the deeds were executed own the title they were designed to convey, as it was clearly its intention to grant this title with the rights and privileges appertaining to or accompanying it, and the improvements to be made upon the property, and if no covenant of title is to be held to have been inserted in the deeds by reason of the restriction and limitation imposed upon the language apparently used for the purpose of creating a covenant, still the city should not be held entitled to defeat this intent under the conveyance made to it by the State pursuant to the act of '1871; for while it is true that no implied covenant can be derived from anything contained in the grants, as

that has been prohibited by the statute (2 R. S. [6th ed.], 1119, § 161), it has still been declared by the like authority that "in the construction of every instrument creating or conveying, or authorizing the creation or conveyance, of any estate or interest in lands, it shall be the duty of courts of justice to carry into effect the intent of the parties so far as such intent can be collected from the whole instrument, and is consistent with the rules of law." (Id., 1130, § 2.) And as it is entirely clear that it was intended by these deeds to convey not only the title to the land described in them to the respective grantees, but to secure them all the benefits and advantages of bulk-heads and wharves on the westerly line mentioned in the descriptions as the permanent exterior line of the city, this section requires that the intent shall be maintained and carried into effect against the city, the party alone now claiming the right to defeat it. It has also been precluded from availing itself of this right by still another provision of the statute which, while it declares that no greater interest or estate shall be construed to pass by any grant or conveyance than the grantor himself possessed at the delivery of the deed, or could then lawfully convey, has still provided "that every grant shall be conclusive as against the grantor and his heirs claiming from him by descent." (Id., 1119, § 164.) This section seems to have been intended to preclude the grantor from gainsaying or defeating the grant made by him, notwithstanding the prohibition that an implied covenant of title cannot be inferred from the conveyance against him or it, for it has declared the grant to be conclusive against the grantor; and it could not be made so if the grantor could afterwards by his own act and of his own volition disaffirm and defeat the grant previously made. Under these sections of the statute requiring this effect to be given to the grant as against the grantor, and the grant itself to be so construed as to carry into effect the intention of the parties to it, the city could not lawfully defeat the right of its grantees and of the plaintiffs' deriving title from them, by reason of the fact that it first acquired the formal title to the land beyond the westerly line of Thirteenth avenue, under the authority of the act of 1871. For as its own grants were made upon the basis of the existence of that title at the time, those grants were afterwards conclusive against it under the language made use of in the statute. And it stood precisely in

the relation to this property with these conveyances where it would have stood if a formal title had been previously acquired by it to the bulk-head line of 1857. That was, as has already been said, designed and extended as the permanent exterior bulk-head line of the city, upon which bulk-heads and wharves might lawfully be erected and forever afterwards maintained, and it was the right so to erect and maintain them that it was one of the purposes of these deeds to convey. That right was accompanied with the additional right to enjoy the advantages, emoluments and benefits of the wharves afterwards erected under the authority of these conveyances. It was as to the city absolute and indefeasible, and it could not supersede or destroy this right without compensating the plaintiffs for its loss, by acquiring title to the land beyond it, from the State, or by any proceeding authorized to be taken by the Laws of 1871 or chapter 738 of the Laws of 1872. The right in terms conveyed to the benefits and advantages of the water front was property vested in the plaintiffs. That was not only sustained in *Langdon* v. *Mayor, etc.*, but it has also, in like manner, been held in *Buccleuch* v. *Metropolitan Board of Works* (L. R., 5 English and Irish App., 418). And when such property might become necessary for making the improvements provided for by chapter 574 of the Laws of 1871, the means were specially enacted for obtaining it either by purchase from the owner or by the right of eminent domain through which adequate compensation would be made to him for it. (2 Laws 1871, p. 1237, chap. 574, § 99, subd. 4.)

As the case has been presented, the plaintiffs were the owners of this property and of the right to enjoy the uninterrupted and unobstructed use and advantages of the bulk-head or wharf as against the defendant, under its own conveyances and the statutes authorizing them to be made, and sustaining their validity against the grantor. It could not, therefore, lawfully deprive them of these rights and privileges in the manner in which it has endeavored to do that. If it had become necessary to extend the exterior line of the city farther to the westward, that could only be done, as it deprived the plaintiffs of these rights and privileges, by making compensation to them. That was not done, but it has been provided in the submission of the case, if the right of the plaintiffs shall be maintained, that their damages shall be ascertained by a

reference, and in that manner full and complete redress will be secured to them for the injury which they have sustained.

Judgment should be directed for the plaintiffs sustaining their right to recover their damages, and directing a reference pursuant to the submission to ascertain the amount.

BRADY, P. J., concurred.

Present — BRADY, P. J., and DANIELS, J.

Judgment ordered for the plaintiffs.