INTERBOROUGH RAPID TRANSIT CO. et al. v. CITY OF NEW YORK et al.

(Supreme Court, Appellate Division, First Department.   March 3, 1916.)

MUNICIPAL CORPORATIONS ☞719—WATER FRONTAGE AND DOCKS—POWERS OF OFFICERS.

Plaintiff was authorized by the board of docks and the Public Service Commission to contract and maintain intake and discharge pipes for condensing purposes under Exterior street and through the bulkhead wall, and to erect on the bulkhead suitable coal-receiving and ash-discharge devices, with the privilege of building coal and ash conveyors over and under the street.   Laws 1887, c. 697, as amended by Laws 1888, c. 272, and Laws 1889, c. 257, provides for the laying out of Exterior street 115 feet wide, and empowers the department of docks to determine on a plan for the street, and to fix the grade of the street, with the concurrence of the commissioner of public works, giving to the department of public works exclusive charge and control of the west 65 feet of the street, and to the board of docks control of the remainder.   Laws 1897, c. 378, as amended by Laws 1901, c. 466, being section 819 of the Greater New York Charter, gives the commissioner of docks exclusive power to regulate the use of marginal streets to the best advantage for use in connection with wharves and bulkheads, and to regulate by license or any other means the transfer of goods or merchandise upon, over or under such marginal streets.   *Held,* that plaintiff could not be required to secure further license than that from the board of docks, since the street was but one street, over which it had exclusive control.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1425, 1529–1535; Dec. Dig. ☞719.]

Clarke, P. J., and Page, J., dissenting.

Appeal from Special Term, New York County.

Proceeding for injunction by the Interborough Rapid Transit Company and the Manhattan Railway Company against the City of New York, and another.   From an order denying plaintiffs' motion for an injunction pendente lite, they appeal.   Reversed, and motion granted.

Argued before CLARKE, P. J., and McLAUGHLIN, LAUGHLIN, SCOTT, and PAGE, JJ.

Henry J. Smith, of New York City, for appellants.
William J. Clarke, of New York City, for respondents.

SCOTT, J.   The order appealed from denies plaintiffs' motion for an injunction pendente lite restraining the president of the borough of Manhattan from removing or interfering with the intake and discharge tunnels and coal-conveying devices erected under and over Exterior street, along the East River, between Seventy-Fourth and Seventy-Fifth streets, connecting with plaintiffs' power house abutting on said Exterior street.   The tunnels are used to supply and discharge the water required for condensing purposes in the power house, amounting to 200,000 gallons per minute, and are laid from said power house under said Exterior street to the East River.   The coal-carrying device is in the form of a bridge erected over Exterior street about 40 feet above the surface, with a coal-hoisting device on the dock opposite the power house.   The conveyors carry from 700 to 1,000 tons

of coal per diem. The power house is erected on Exterior street, between Seventy-Fourth and Seventy-Fifth streets, occupying the whole block front, and supplies the entire elevated railway system of the plaintiffs with power, except on a portion of the Sixth and Ninth Avenue lines. The use of the intake and discharge tunnels and the coal conveyor is necessary, as matters now stand, for the operation of the power house. It was made quite clear on the argument that there is no real desire on the part of the defendants to compel the removal and· discontinuance of the said tunnels and conveyor, but their claim is that plaintiffs have erected and are using said devices without lawful authority, and wish to compel plaintiffs to apply for and obtain from what defendants insist is the proper municipal authority a permit or franchise to continue the use and maintenance of said facilities.

There is nothing in the case which will require the taking of any· evidence, the facts being all admitted, and the determination of the questions involved, being dependent upon certain statutes and written documents of record, will therefore be determinative of the action. The authority upon which plaintiffs rely consists of two agreements between the plaintiff Manhattan Railway Company and the board of docks, one dated May 31, 1900, and the other dated July 27, 1910, and a permit or authorization from the Public Service Commission dated September 27, 1913. By the agreements above referred to the said Manhattan Railway Company is given the right:

"To construct and maintain, during the term of the lease hereby demised and any renewals thereof, intake and discharge pipes for condensing purposes under the marginal street and through the bulkhead wall, and to erect on said bulkhead suitable coal-receiving and ash-discharge devices, with the privilege of placing coal and ash conveyors over and under the marginal street."

If the board of docks had power to grant to the railway company the right to cross the whole of the marginal street by its tunnels and coal conveyor, there seems to be no doubt, and as I understand it no question is made, that the agreements constitute a sufficient permit and authorization so to do. The defendants claim, however, that in so far as concerns the westerly 65 feet of said marginal street the board of docks had no such power, and therefore that as to said portion of the street its attempted authorization was ineffective. The question involved is therefore merely as to which city department has been vested with power and authority to grant a permit for such structures.

Exterior street was laid out and established by chapter 697, Laws of 1887, amended by chapter 272, Laws of 1888, and chapter 257, Laws of 1889. The first section of that act reads as follows:

"Section 1. There shall be laid out and completed upon and after the filing of a plan therefor, and as provided by this act, an exterior street of one hundred and fifteen feet in width, extending along the westerly shore of the East River in the city of New York, from the center line of East Sixty-Fourth street, as such line is and would be, if extended eastwardly into the East River, to the northerly line of East Eighty-First street, as such line is and would be if extended eastwardly into the East River."

By the second section of the act the board of the department of docks was intrusted with the duty of determining upon a plan for

the said street, and it was provided that the plan, when approved by the commissioners of the sinking fund, should be "the plan according to which said street shall be laid out and completed." By the fourth section it was provided that the grades of the "whole of said exterior street shall be fixed by the * * * board of the department of docks, with the concurrence of the commissioner of public works," and as to the charge and control of the street when laid out it was provided as follows:

"That portion of said street lying and being between its westerly line and a line drawn parallel with such westerly line, and sixty-five feet easterly therefrom, shall be and remain under the exclusive charge and control of the department of public works, as is now provided by law for the other public streets in the city of New York, and the remaining portion of said street lying easterly of said sixty-five feet line shall be and remain under the exclusive charge and control of the said department of docks."

It was also provided that:

"The said street, and the bulkhead forming its outer edge, shall be and remain at all times a public exterior street or wharf, for free and common use except as herein otherwise provided, and the same and the wharfage and emoluments arising from the use thereof shall be the property of the corporation of the city of New York."

I have quoted thus fully from the Act establishing the exterior street to emphasize the fact, which seems to me to be of consequence, that but a single street 115 feet wide was provided for, not a street 65 feet wide and a dock or wharf 50 feet wide, although a part of this street was ordained to remain under the charge of the department of public works and a part under the charge of the department of docks.

The important legislative enactment bearing upon the question now under consideration is section 819 of the Greater New York Charter (chapter 378, Laws 1897, amended by chapter 466, Laws 1901). This section was derived from section 712 of the New York City Consolidation Act (chapter 410, Laws 1882), which was itself frequently amended, and always in the direction of extending and increasing the authority and jurisdiction of the department of docks over the water front of the city and the lands adjacent thereto. See chapter 567, Laws 1887; chapter 482, Laws of 1890; chapter 158, Laws of 1892; chapter 397, Laws of 1893. Finally section 819 of the Charter conferred upon the commissioners of docks a broader power respecting marginal or exterior streets than had ever before been conferred upon the department of docks. It provided as follows:

"The commissioner of docks shall have exclusive power to regulate the use of marginal streets so that the land and buildings upon all such marginal streets may be used to the best advantage in connection with the wharves and bulkheads; and the commissioner of docks shall have the power to regulate, by license or by any other suitable means, the transfer of goods and merchandise upon, over or under all such marginal streets; except that the said commissioner of docks shall not, under this section, have any power in respect to, or jurisdiction over, the public driveway. authorized by and constructed under chapter 102 of the Laws of 1893 and acts amendatory thereof [the speedway on Harlem River]."

It may well be true, as insisted by defendants, that this new enactment did not change or attempt to change the status of any street, or to convert the westerly 65 feet of the exterior street from a street into a wharf or bulkhead. Doubtless that 65 feet still remained a part of the street system of the city, and so far as concerns its care and general control continued to be in the charge of the borough president, as successor to the former department of public works. But the power to regulate its use in regard to the transfer of goods, wares, and merchandise upon, over, and under it was distinctly conferred upon the commissioner of docks. I can find, neither in the act of 1887 establishing the exterior street, nor in the sections of the Charter from which I have quoted, any warrant for holding that the power given by the Charter to the commissioner of docks was intended to be limited to the outer 50 feet of the street.

Exterior street, as already pointed out, was established as one street, of the width of 115 feet, and the authority to lay it out, and to establish its grade for its whole width, was from the first given to the dock department, and so far as I can find, from an examination of the statutes, it has never ceased to be a single street for its whole original width. The declared purpose of the Charter, in conferring upon the dock commissioner power to regulate its use, is "so that the lands and buildings upon all such marginal streets may be used to the best advantage in connection with the wharves and bulkheads." The lands and buildings upon a marginal street must of necessity lie upon the inshore sides of such streets, and the wharves and bulkheads must, of like necessity, lie upon the offshore sides. If the commissioner of docks is to regulate the use of such streets, so that the lands and buildings may be used to the best advantage in connection with the wharves and bulkheads, and to that end is given power to regulate by license or other suitable means the transfer of goods and merchandise upon, over, or under such marginal streets, that power, to be effectually exercised, must extend to the whole street lying between the lands and buildings, on the one hand, and the wharves and bulkheads, on the other. To confine it to the outwardly 50 feet of a 115-foot street would be to neutralize the statute and prevent the doing by the dock commissioner of that which he is expressly authorized to do.

To so hold is not in conflict with, but entirely in accord with Vilias v. Featherson, 94 App. Div. 259, 87 N. Y. Supp. 1094, cited upon the briefs of both appellant and respondent. That case had to do primarily with the question whether or not the dock department could lease dock property for commercial purposes unconnected with water front usage, but in the course of the discussion reference was had to section 819 of the Charter in the following language:

"The further provision of section 819 of the Charter that the commissioner of docks should have the exclusive power to regulate the use of marginal streets, so that the land and buildings upon all such marginal streets might be used to the best advantage, in connection with the wharves and bulkheads, did not refer to the land and buildings in the marginal streets, but to the abutting land and buildings, thus emphasizing the intention that these streets should be so used in connection with the wharves and the abutting land and buildings thereon as would best conserve the general purposes of commerce. For that purpose, undoubtedly, the commissioner could authorize the con-

struction of machinery for loading and unloading ships, and carrying the merchandise therefrom to the adjoining property, although such a use would be inconsistent with a strict street use. * * * He is given authority to lease the wharves and piers, and incidental authority in connection with such leases to control the marginal streets which are adjacent to such piers and bulkheads."

For these reasons I am of opinion that the right given to the Manhattan Railway by the dock department in 1900 and 1910 was sufficient to warrant the construction and maintenance of the tunnels and coal conveyor hereinbefore described, and consequently that the order appealed from should be reversed, with $10 costs and disbursements and the motion granted. Order filed.

McLAUGHLIN and LAUGHLIN, JJ., concur.

PAGE, J. (dissenting). This is an appeal from an order denying plaintiffs' motion for an injunction pendente lite to prevent the president of the borough of Manhattan from removing or interfering with certain overhead and subsurface structures maintained by the Interborough Rapid Transit Company or its lessor, the Manhattan Railway Company.

The plaintiffs' power house is situated on the west side of Exterior street between Seventy-Fourth and Seventy-Fifth streets. It also holds a lease of the bulkhead on the East River between Seventy-Fourth and Seventy-Fifth streets. The structures which the city authorities threaten to remove are the intake and discharge tunnels used to supply and discharge the water required for condensing purposes in the power house, and a bridge erected 40 feet above Exterior street, in which is a coal-carrying device, connecting the power house with a coal hoist erected upon the bulkhead. The city of New York claimed that the bridge and tunnels are illegal structures, and, unless the plaintiffs applied for a permit to maintain them, the borough president was directed to remove them on December 1, 1915. The plaintiffs claim that the structures are lawfully in the street under a contract with the dock department, and that since 1902 the structures have been maintained under such contract, except a new intake tunnel was constructed in the year 1914 by virtue of a permit of the dock department, under the direction and supervision of the Public Service Commission. The plaintiffs further contend that the occupation of Exterior street by the tunnels and the coal conveyor is a right necessary and incidental to the operation of a power house, and as such a necessary incident of its general franchise to operate a railroad by electricity.

This plea of necessity in my opinion is entitled to little consideration. Even if we should concede that the manufacture of its own electric power is a necessary adjunct to the operation of its franchise, the transportation of coal by conveyors within streets of the city, or the transportation of water by means of tunnels in the street, is not necessary to the operation of a power house. No doubt, with a power house situated as is this one, such transportation is more economical and of greater convenience than would be possible by other means; but this is not synonymous with necessity. The plaintiffs operate their road

through a large portion of the boroughs of Manhattan and the Bronx. Direct access to the water front is possible in many localities, as near to its lines of road as the one in question, and I think we can take judicial notice of the fact that several large power houses for the manufacture of electric current, both for commercial and transportation use, are situated directly upon the water front. That electric current may be and is transmitted great distances from the place of manufacture to the place of use is also a well-known scientific fact. There is, therefore, not the same necessity for a close proximity between the power house and the road that would justify the appropriation of certain streets to its use.

The case of Brooklyn Heights R. R. Co. v. City of Brooklyn, 152 N. Y. 244, 46 N. E. 509, relied upon by appellants, is clearly distinguishable from the instant case. In that case the company was prohibited by its grant of franchise from locating its car barns on any of the streets immediately contiguous to its line of road, but was given authority to construct and maintain in "said street" (that upon which its road was to be constructed), "and in such parts of those adjacent thereto as may be necessary, connections, switches  *  *  *  for the convenient operation of said road and the housing and care of its cars and other equipments.  *  *  *"  The Court said:

"When we consider the question of the existence of authority in the plaintiff to use these other streets, for the purpose of having a storehouse and of connecting its railroad therewith, I think we may readily dispose of it upon the theory that it was a reasonable necessity, impliedly, if not expressly, sanctioned by the law of its creation."

This case cannot be cited as an authority for the appropriation by a railroad corporation of rights in streets, not expressly or impliedly within its grant, merely because of convenience or economy of operation, nor even on the plea of necessity, to appropriate to its use public or private property without compensation. The right to acquire property by eminent domain was given to such corporation that it might be able to acquire such property as was necessary for the proper operation of its franchise upon an adequate payment for property taken, and for the reason that the use by it of such property as was necessary for its operation was to the public advantage and convenience. Whatever rights the plaintiffs have to use this street rest upon the permission given by the dock department. Undoubtedly the right to construct and maintain the tunnels and the coal conveyor from the water front to the power house was expressly given by that department, and if it was within the powers of that department the city cannot disturb or interfere with the plaintiffs' use of such structures. It is therefore necessary to consider the authority of the dock department over the street.

Exterior street, from Sixty-Fourth to Eighty-First street, was laid out and established under and by virtue of an act of the Legislature of the state of New York (Laws 1887, c. 697, amended by Laws 1888, c. 272, and Laws 1889, c. 257) which provided for an exterior street of 115 feet in width extending along the westerly shore of the East River from the center line of East Sixty-Fourth street to the norther-

ly line of East Eighty-First street. The plan for the street was to be prepared by the dock department, subject to the approval of the commissioners of the sinking fund, and the act provided that:

"Said plan on its approval shall be the plan according to which the said street shall be laid out and completed, and also the sole plan according to which any wharf, pier, bulkhead, basin, dock or slip or any wharf structure or superstructure shall thereafter be laid out in that part of the water front included in and specified upon said plan." "That portion of the said street lying and being between its westerly line and a line drawn parallel with such westerly line, and sixty-five feet easterly therefrom shall be and remain under the exclusive charge and control of the department of public works, as is now provided by law for other public streets in the city of New York, and the remaining portion of said street lying easterly of said sixty-five foot line shall be and remain under the exclusive charge and control of said department of docks."

Pursuant to the provisions of this act condemnation proceedings were instituted and title was vested in the city on confirmation of the report of the commission. The fee in the 65-foot strip was condemned for street purposes, and the expense was assessed and paid by the adjoining property owners, while as to the 50-foot strip the fee simple was taken and the expense of acquiring it was paid by the city from the proceeds of the sale of dock bonds. Laws 1887, c. 697, § 6; Laws 1882, c. 410, § 143. The commissioner of public works was, by the act of 1887, amended as aforesaid, required to regulate, grade, and otherwise improve "that portion of said street hereinbefore placed under the control of the department of public works," and "the department of docks is hereby authorized and directed * * * to regulate, grade and otherwise improve that portion of said Exterior street which by this act is placed under the charge and control of said department of docks." The department of docks is given power to lease the wharfage, and they may give an exclusive right to the use and occupancy by the lessee of that part of the street or wharf lying east of a line drawn parallel to and 100 feet easterly of the westerly line of said street.

It is evident from these considerations that the 65 feet of the westerly portion of said street was not under the jurisdiction or control of the department of docks, and that the jurisdiction and control of the department of docks was limited to the 50-foot strip adjacent to the bulkhead. This is the clearly expressed provision of law. While in the changes made necessary by the reclassification of many administrative departments by the Greater New York Charter I do not find anywhere an express repeal of the powers given to the commissioner of public works over this portion of Exterior street, the power has devolved upon the borough president, and together with other public streets certain powers have been given to the board of estimate to grant permits or franchise rights within it. Nor do I find in the various laws to which the appellant has referred anything that shows an intention of giving the department of docks jurisdiction and control over the westerly 65 feet of this street, or to change the purpose of its use from street to wharf purposes.

Section 819 of the Greater New York Charter is a re-enactment of section 712 of the Consolidation Act of 1882, as amended by chapter

482 of the Laws of 1890, chapter 158 of the Laws of 1892, and chapter 397 of the Laws of 1893. As originally enacted, section 712 undoubtedly was limited in its application to such portions of the water front as were authorized by the third subdivision of section 99, of chapter 137 of the Laws of 1870, as amended by section 6 of chapter 574 of the Laws of 1871. By reference to these statutes it appears that the plans were to be prepared by the department of docks and were to be—

"the sole plan according to which any wharf, pier, bulkhead, basin, dock or slip, or any wharf, structure or superstructure shall thereafter be laid out or constructed within the territory or district embraced in and specified upon such plan, and be the sole plan and authority for *solid filling* in the waters surrounding said city and for extending piers into said waters and erecting bulkheads around said city."

There is no mention in this act of the establishment, opening, or use of public streets. The expenses of acquiring lands under water or uplands were to be paid from the proceeds of dock bonds, authorized to be issued for that purpose. Such marginal streets, therefore, as were laid out upon the plan, were a portion of the dock property and established for access to and the convenient use of bulkheads, wharves, and piers shown upon the plans. Most of this property was formed by filling in of the land between high and low water mark, which already belonged to the city. For a detailed historical statement, see Langdon v. Mayor, etc., 93 N. Y. 129.

By chapter 482 of the Laws of 1890, the words "including the water front on the westerly side of the Harlem River from the easterly line of Third avenue along the water front from said line to the northerly side of Eighty-Sixth street" were interpolated. In chapter 397 of the Laws of 1893 certain acts relating to the powers of the department of public works and other departments of the city government were expressly repealed, but the act under which the street under consideration was established and constructed was not mentioned.

Section 819 of the Charter, by its terms, in so far as it relates to the repeal of laws inconsistent with that section, relates only to the territory embraced within that section, which, as we have seen, is such as appeared upon the plan authorized by the act of 1871. The premises under consideration were not in that part of the city covered by the plan of 1871, nor embraced in the territory from Harlem River to East Eighty-Sixth street, but included in the plan authorized by a special act (Laws 1887, 1888, and 1889, supra), which, so far as the marginal street was concerned, created an entirely different condition; i. e., by creating a marginal street of 50 feet in width, similar in all respects to the marginal streets in the plan authorized by the act of 1871, and, in addition thereto, a public street 65 feet in width. In this public street there existed the usual easements of the public and abutting property owners, which did not obtain in the marginal street under the plan of 1871, nor in the 50-foot part of this street. Chapter 697, Laws of 1887, and the acts amendatory thereof, are not repealed by section 819 of the Greater New York Charter, and are still in full force and effect.

We call attention to the fact that the case of Vilias v. Featherson, 94 App. Div. 259, 87 N. Y. Supp. 1094, related to the marginal streets as laid down on the plan adopted pursuant to the act of 1871, and is not, for the reasons already stated, to be construed as dealing with the power of the dock department in relation to buildings abutting the public street in the instant case.

The right to construct a bridge over or tunnels under the street would argue the right of the dock department to build a railroad upon or elevated above the street, if the commissioner of docks should deem that to be a use "to the best advantage in connection with the wharves and bulkheads." This right could not be conferred without the condemnation of and compensation for the taking of the easements of the abutting property owners in the public street.

It follows that, in so far as the contract and permit of the dock department assumed to grant permission to the plaintiff to build and maintain the bridge for coal conveyors over, or the tunnels under, the westerly 65 feet of the exterior street, they were void, and the plaintiffs are unlawfully maintaining such structures. We are of opinion that the use of these structures is so related to the railroad facilities and purposes that the board of estimate and apportionment has power to grant the right to their use and maintenance.

The order should be affirmed, with $10 costs and disbursements.

CLARKE, P. J., concurs.