ROCKAWAY PACIFIC CORPORATION, Claimant, *v.* THE STATE OF NEW YORK.

Claim No. 15825.

THE CITY OF NEW YORK, Claimant, *v.* THE STATE OF NEW YORK.

Claim No. 15810.

Court of Claims, January (Received February, 1924).

**Claims against state — lands appropriated by state and ceded to United States for war purposes — Laws of 1917, chaps. 13, 130 — Rockaway peninsula, Queens county — release by state of all its interest, right and title to lands in question by virtue of Laws of 1887, chap. 560.**

**Ownership by accretion — claimant, the owner of lands above mean low water, entitled to award representing difference between market value of the property immediately prior to and immediately after its appropriation — award to city of New York for property below mean low water.**

The Court of Claims has jurisdiction to determine the amount of compensation that should be paid to the owners of certain lands on Rockaway peninsula, county of Queens, appropriated by the state pursuant to statute (Laws of 1917, chap. 13, as amd. by Laws of 1917, chap. 130) to provide for the public defense by ceding said lands to the United States for the erection of a fortification thereon to protect the harbor of New York.

The city of New York, claiming to own all the land in the appropriated area below the line of mean high water, filed its claim against the state for $225,000, the alleged value of all such lands. Within a month thereafter claimant, making a like claim of ownership, except as to five and one-half acres below mean low water, owned by the city of New York, filed a claim against the state for $1,600,000, of which amount claim was made that $1,100,000 was the value of the total area taken by the state less the said 5.5 acres, and comprising 311.9 acres. Consequential damages to the amount of $700,000 to about 561.7 acres specified as " remaining lands " by reason of the appropriation by the state were also claimed by claimant. The state claimed title to a portion of the upland within the appropriated area and to all of the upland westerly thereof. Under a stipulation entered into between the state, the city of New York and claimant, the aforesaid claims were tried together and all questions of title to the lands appropriated and all adverse and conflicting claims to the award were submitted to the court. Upon consideration of the evidence relating to the history and circumstances of the ownership of the lands in question, *held:*

That by the statute (Laws of 1887, chap. 560) the state intended to and did release unto one A. all and every interest, right, title, claim and demand in the lands at the westerly end of the Rockaway peninsula, here in controversy, not only to the high-water line but also to the line of mean low water of the Atlantic ocean, Rockaway inlet and Jamaica bay.

That since said release the growth of Rockaway point to the westerly has not been by avulsion nor by the annexation of islands but by the continual and gradual process of accretion, and that the ownership of the said grantee of the state, and his successor in title, extended westerly with the point as it thus advanced.

That at the date of the appropriation by the state under the statute of 1917, the claimant herein was the owner in fee simple to the line of mean low water of all the property taken by the state, being all of the lands appropriated by it, except five and one-half acres below the line of mean low water, title to which at that time was vested in the city of New York.

Upon consideration of all the testimony submitted to the court upon the question of consequential damages to the real property of the claimant at the westerly end of the Rockaway peninsula, an award is made to the claimant in the sum of $1,266,450, representing the difference in the fair and reasonable market value of said property, immediately prior to and immediately after its appropriation by the state under the statute of 1917, and an award is made to the city of New York of $3,000 for the five and one-half acres below mean low water.

Claims for appropriation of lands.

*Gordon M. Buck* (*Charles E. Hughes,* of counsel), for the Rockaway Pacific Corporation.

*William P. Burr* and *George P. Nicholson,* corporation counsels (*Charles J. Nehrbas,* assistant corporation counsel, *John J. Mead,* deputy assistant corporation counsel, and *Willoughby B. Dobbs,* assistant corporation counsel, of counsel), for the City of New York.

*Charles D. Newton* and *Carl Sherman,* attorneys-general (*James Gibson, George L. Meade* and *George I. Sleicher,* deputy attorneys-general; *H. H. Cameron,* special deputy attorney-general; *Clifford Couch,* deputy attorney-general, of counsel), for the State of New York.

Ackerson, P. J. On April 4, 1917, the State of New York appropriated 317.4 acres of land on Rockaway peninsula, county of Queens, in the city and state of New York. This appropriation was made in pursuance of chapter 13 of the Laws of 1917, as amended by chapter 130 of the Laws of 1917. War between the United States of America and the Imperial Government of Germany was then imminent and the purpose of the appropriation was to provide for the public defense by ceding these lands to the United States for the erection of a fortification thereon to protect New York harbor.

The statutes above referred to conferred upon the Court of Claims jurisdiction to determine the amount of compensation that should be paid to the owners of such lands.

Thereafter and on or about March 19, 1919, the city of New York, claiming to own all the land in the appropriated area below the line of mean high water, filed its claim against the state for $225,000, being the alleged value of all such lands. On or about April 2, 1919, the Rockaway Pacific Corporation, claiming to own all of the appropriated area, except 5.5 acres below mean low water, filed its claim against the state for $1,800,000. It

claimed $1,100,000 to be the value of the total area taken, less 5.5 acres below mean low water owned by the city of New York, and comprising 311.9 acres. It claimed consequential damages of $700,000 to about 561.7 acres of land specified as "remaining lands" by reason of said appropriation. The state of New York claimed title to a portion of the upland within the appropriated area and all the upland westerly thereof.

A stipulation was thereafter entered into by the state of New York, the city of New York, and the Rockaway Pacific Corporation, whereby it was agreed that the aforesaid claims be tried together and all questions of title to the lands appropriated and of all adverse and conflicting claims to the award be submitted to the Court of Claims.

The claims proceeded to trial. A large amount of oral and documentary evidence was submitted to the court. Many questions of law and of fact are involved. But it seems to us that the final decision as to the title and ownership of the appropriated parcel must depend upon the determination of two questions, one of law and one of fact.

First, as to the question of law which is, briefly, whether the state of New York transferred to Henry Y. Attrill by chapter 560 of the Laws of 1887 all of its title to that portion of the westerly end of Rockaway peninsula between mean high and mean low water or whether it did not. In order in our judgment to properly decide this question, it is necessary to take into consideration the history and circumstances of its ownership.

It appears from the evidence that prior to November 3, 1685, the title to all of Rockaway peninsula, on which the appropriated parcel of land here in dispute is situated, both as to upland and to foreshore or tideway was vested in the British crown; that on said November 3, 1685, Lieutenant-Governor Thomas Dongan executed and delivered to John Palmer a royal grant or patent which by its terms granted to said Palmer, his heirs and assigns forever, the westerly end of Rockaway point lying west of the west patent line of the town of Hempstead, specifically bounding said tract by the low water line of the "Maine Sea or Ocean;" that said grant also granted "all manner of pastures, feedings, meadows, marshes, beach or beaches," and thereby the title to all of the foreshore or tideway to low-water mark on Rockaway inlet and Jamaica bay side of and adjacent to Rockaway peninsula became vested in John Palmer. In other words, the British crown divested itself not only of its title to the upland of the westerly end of Rockaway peninsula, but also of its title to the foreshore between mean high and mean low water and invested it in one

individual, to wit, John Palmer. In 1687 the said John Palmer and Sarah, his wife, conveyed the same premises which he had received from the crown to Richard Cornell, Sr.

Thereafter the title to the westerly end of Rockaway peninsula to the low-water line remained vested in the heirs, devisees, descendants and grantees of the descendants of Richard Cornell, as tenants in common until June 6, 1809, more than 100 years, when in and by a final decree in partition the westerly end of Rockaway peninsula as above described from a line east of the easterly line of the lands appropriated by the state on April 4, 1917, was allotted and set off to William Cornell.

Thereafter, and on July 1, 1809, the said William Cornell and Nellie, his wife, conveyed the same premises at the westerly end of Rockaway peninsula to Nathaniel Ryder. Said Nathaniel Ryder and Phebe, his wife, the next day, on July 2, 1809, executed and delivered to the said William Cornell a purchase-money mortgage on said property, which mortgage was recorded in the Queens county clerk's office November 14, 1810.

Thereafter, and so far as the evidence discloses, without obtaining any release from the lien of the foregoing mortgage, the said Nathaniel Ryder and Phebe, his wife, on June 25, 1814, conveyed a part of his property, comprising the extreme westerly end of Rockaway peninsula to the People of the State of New York, which conveyance included all the land and beach comprising the westerly end of Rockaway point " bounded South by the ocean, West by the inlet, North by the bay, East by land of the parties of the first part, together with all the appurtenances, privileges, advantages and hereditaments whatsoever."

The foregoing deed was recorded in the office of the secretary of state of the state of New York on August 6, 1835. Said deed transferred to the people of the state the westerly end of Rockaway point to mean low water as it had been received from the British crown by John Palmer. In none of the foregoing conveyances had the foreshore or land between high and low water been reserved, and there can be no doubt that the title thereto was vested in Nathaniel Ryder when he executed his deed to the people of the state of New York as aforesaid.

It does not appear that the state made any use of the property conveyed to it under the foregoing deed, or that it was generally known that it had obtained title to the westerly end of the point.

The United States built a block house thereon at about the time the property was conveyed to the state and thereafter for some years the ownership of the westerly end of the point was referred to as being in the United States and not in the state of New York.

The case of *Wright* v. *Phipps*, 90 Fed. Rep. 556, was a suit in equity for the foreclosure of a purchase-money mortgage on the westerly end of Rockaway peninsula and which was consolidated with other actions, in which cross bills were filed for the cancellation of such mortgage. The case was heard in the Circuit Court of the United States in the Eastern District of New York in 1898. Judge Thomas in his opinion speaks of the deed of Ryder to the state as follows (p. 558): " In 1814, Ryder conveyed to the state of New York the westerly portion of the 200 acres, which, with the additions above mentioned, contain the land in controversy. The deed to the state appears to have been recorded in the office of the secretary of state in 1835, out of its chronological order, but there is no evidence that any of the parties to the present controversy, or any of their agents, had knowledge of such deed or record, until the year 1884, when the state of New York asserted a claim to the land."

That statement of Judge Thomas is supported by the evidence in this case except that it appears that the state of New York did not commence an ejectment action to obtain possession of the land it had received from Ryder in 1814 until 1885. For seventy-one years the land of the state had passed by successive conveyances until it was apparently, so far as the record in Queens county disclosed, vested in Henry Y. Attrill in 1885. There is no break in the record title from Ryder down to Attrill except the foregoing deed from Ryder to the state given on June 25, 1814. This deed was recorded at Albany in the office of the secretary of state in 1835, and so far as the evidence discloses was unknown and unheard of for many years prior to 1885. Prior to the date of this deed to the state, Ryder had on July 7, 1809, given a purchase-money mortgage to Cornell covering the same property, as we have previously pointed out.

In 1814 when the state received said conveyance, the said mortgage had not been paid and the lien thereof was still an incumbrance on the land so conveyed to the state. Nor does it anywhere appear in the evidence that the state ever secured a release from the lien of this mortgage. In 1830 and 1831 this mortgage given by Ryder to Cornell in 1809 was foreclosed by advertisement and the property sold to Rothery Ryder and Henry Hewlett. The state contends that this mortgage foreclosure was invalid by reason of errors that appear on the face of the papers. We will not take the space to discuss these alleged errors. We deem it sufficient to say that we do not agree with this contention and hold the mortgage foreclosure to be valid.

The claimant contends that this mortgage foreclosure being valid

cut off and foreclosed all the rights of the state in and to the property in question. It will be observed that the deed to the state was not recorded for more than four years after the foreclosure.

There is considerable ground for the claimant's contention, and if it were not for the fact that the deed which Rothery Ryder and Henry Hewlett received at the end of the foreclosure proceedings does not in terms convey the westerly end of Rockaway point, such contention might be well founded.

The notice of the sale under the mortgage foreclosure described the property to be sold as follows: " All that certain lot of Beach and premises situate in the County aforesaid, bounded South by the sea, West by the inlet, North by Bay and East by the Beach, belonging to Rulf Duryea containing two hundred acres more or less."

The auctioneer who sold the property certifies that the foregoing premises were the same premises put up at auction and struck off to Rothery Ryder and Henry Hewlett. But in the deed executed by David T. Jennings to Rothery Ryder and Henry Hewlett on the 16th day of May, 1831, in pursuance of said foreclosure proceedings, the property is described as follows: " All that certain lot of Beach and premises situate lying and being in the County aforesaid. Bounded south by the Sea, west by land belonging to the United States, north by the Bay and east by Beach belonging to Rulef Duryea." It is clear to us, therefore, that at the time when the deed was given it was the intent of the parties thereto to exclude from the conveyance the property at the westerly end of the point or peninsula. The language used in the deed is adequate to carry out that intention and the title to the westerly end of Rockaway peninsula remained in the state of New York. It is immaterial that the parties to the deed thought that the title to the westerly end of the point was in the United States. The important fact is that the deed to Ryder and Hewlett did not include it.

While the ownership of the westerly end of Rockaway peninsula, therefore, remained in the state of New York after said foreclosure, yet the state did not assert its ownership in any way, and for years afterwards the land at the westerly end of the point was referred to as the property of the United States.

Later on the heirs of Nathaniel Ryder executed quit-claim deeds of said property which included the westerly end of Rockaway peninsula and said deeds were recorded in the Queens county clerk's office in 1872. Thereby a record title was started which was adverse to that of the state of New York. From this time on the complete ownership of the westerly end of Rockaway

peninsula to the low-water mark, so far as the records in Queens county disclosed, was in private persons.

And finally by various mesne conveyances, which by their terms included the westerly end of Rockaway peninsula, Henry Y. Attrill by deed dated September 11, 1882, succeeded to the title of the heirs of Rothery Ryder and Henry Hewlett under conveyances which purported to convey to him and his immediate predecessors the entire title to the westerly end of Rockaway peninsula as received by John Palmer from Lieutenant-Governor Dongan.

This was the situation when the state first asserted the title and ownership which it had received from Nathaniel Ryder in 1814. By a summons dated February 19, 1885, and a complaint verified by the attorney-general March 13, 1885, it commenced an action in ejectment against Henry Y. Attrill and his lessee, Eugene Smith, to obtain possession of the westerly end of Rockaway peninsula described in said complaint as follows: " All that point and peninsula of land known as Rockaway Beach in the Town of Hempstead, County of Queens and State of New York which lies West of a line running due North from the Atlantic Ocean to Jamaica Bay and intersecting a line running South seventy-five degrees west from the land formerly of Rothery Rider but now or late of Garrett Eldert, at a point on said line distant one hundred and forty-four chains from said land formerly of Rothery Rider, said premises being bounded Easterly by said line running North from the Atlantic Ocean to Jamaica Bay, South by the Atlantic Ocean, West by the Atlantic Ocean, and North by Jamaica Bay, be the same more or less."

Both of the above-named defendants served their answer to said complaint in ejectment and issue was joined. Both answers denied the allegations of the complaint and alleged that Henry Y. Attrill was and for more than forty years prior thereto he and those through whom his title was derived had been the true and only owners of the said lands, and seized of the same by a good title in fee simple, and that at all such times had been in the possession and occupation of the said premises, etc.

This action never went to judgment. The court was never permitted to pass on the issues raised by the pleadings. Instead of seeking a final determination at the hands of the court the parties sought to and did compose their differences by mutually agreeing to a settlement between themselves.

This property had by this time become very valuable property and was rapidly increasing in value. Its ownership, therefore, was a matter of great importance to the party legally entitled to it. In the year 1881 it had been sold at a public auction fore-

closure sale for $185,000, which fact was a matter of record.   After the ejectment suit brought by the state had been pending for more than two years, the parties reached their agreement of settlement which was embodied in an act of the legislature known as chapter 560 of the Laws of 1887.

This act reads as follows:

" An Act for the release of any interest of the State in lands in the town of Hempstead, Queens County, to Henry Y. Attrill.

Passed June 13, 1887, by a two-third vote.

" *The People of the State of New York, represented in Senate and Assembly, do enact as follows:*

" SECTION 1. All right, title and interest, claim and demand, of the State of New York, in and to all that point and peninsula of land known as Rockaway Beach, in the town of Hempstead, county of Queens, and State of New York, which lies west of a line running due north from the Atlantic Ocean to Jamaica Bay, and intersecting a line running south, seventy-five degrees west, from the land formerly of Rothery Ryder, but now or late of Garrett Eldert, at a point on said line, distant one hundred and forty-four chains from said land formerly of Rothery Ryder, said premises being bound easterly by the said line running north from the Atlantic Ocean to Jamaica Bay; south by the Atlantic Ocean; west by the inlet; and north by Jamaica Bay; is hereby released to Henry Y. Attrill upon the payment by him within sixty days after the passage of this act, to the Comptroller of the State, of the sum of twenty thousand dollars, and of all sums of money which the Attorney-General and Comptroller shall certify to have been expended or incurred by the State in and about the investigation of the claim of the State to the said lands, and in establishing its title thereto.

" § 2. This act shall take effect immediately."

Thereafter within the time limit mentioned in the act Attrill paid the state the sum of $20,000, together with about $3,000 additional to cover its expenses in connection with the suit, and thereafter on October 22, 1887, the said ejectment action was discontinued by consent.

It seems apparent to us that the state did and intended to release to Attrill at this time just what the words of the act imply, namely, all the interest it claimed in all the point or peninsula. This means to the low-water mark if it means anything.   There can be no possible title left in the state after a release on its part with such comprehensive language as is contained in the act in question.

The state and the city contend, however, that this was a grant from the state and that it did not carry beyond high-water line unless in express terms it specified that it went to mean low water.

This, we believe, is too strict a construction to place upon that well-known rule. That rule, however, does not apply to this case even if this could be called a grant. Grants by the sovereign for a valuable consideration as in this case have never been subject to that rule. In such cases, the same rule prevails as between private grantors and grantees.

Here the state had never owned the property in question as public lands with a proprietary title extending to mean low water. All the title it possessed it received from a private owner by deed. It had slept on its title for over seventy years without making any claims to the property. In the meantime the claimant's grantor had come into possession of the property under a record title that apparently extended to mean low water.

The Rip Van Winkle state awakes out of its long sleep and commences its ejectment action setting forth the description of the property in its complaint in almost the identical language of its deed from Ryder. The action languishes for two years when the state agrees to release to Attrill whatever claim it has in the property for $20,000 and expenses which Attrill pays and the ejectment action is discontinued. Again the state sleeps for thirty years when behold it comes forth with the claim that it never parted with its title to the foreshore.

We cannot agree with this contention.

In the case of *Langdon* v. *Mayor, etc., of the City of New York*, 93 N. Y. 129, 146, we find the following: " In *Charles River Bridge* v. *Warren Bridge* (7 Pick. 344, 462), Martin, J., speaking of public grants, said: ' Although no distinct thing or right will pass by implication, yet I do not mean to question that the words used should be construed in their most natural and obvious sense, and that whatever is essential to the enjoyment of the thing granted will be necessarily implied in the grant.' * * * In the same case, Wilde, J., said that in doubtful cases it seemed to him ' a sound and wholesome rule of construction to interpret public grants most favorably to the public interest, and that they are not to be enlarged by doubtful implication;' but he said: ' There are some legislative grants no doubt that may admit a different rule of construction, such as grants of land on valuable consideration and the like. It is that, when the king's grants are upon a valuable consideration, they shall be construed favorably to the patentee for the honor of the king. (Bac. Abr., Prerog. F. 2.)' In the same case in the United States Supreme Court (reported in 11 Peters,

420), Taney, C. J., approved the general rule above referred to for the construction of public grants, and at page 549, speaking of the charter there under consideration, said: ' In charters of this description no rights are taken from the public, or given to the corporation, beyond those which the words of the charter, by their natural and proper construction, purport to convey. There are no words which import such a contract as the plaintiffs in error contend for.' At page 557, McLean, J., said: ' In ordinary cases a grant is construed favorably to the grantee and against the grantor. But it is contended that in governmental grants nothing is taken by implication. The broad rule thus laid down cannot be sustained by authority. If an office be granted by name, all the immunities of that office are taken by implication. Whatever is essential to the enjoyment of the thing granted must be taken by implication. And this rule holds good whether the grant emanates from the royal prerogative of the king of England, or under an act of legislation in this country. The general rule is that ' a grant of the king at the suit of the grantee is to be construed most beneficially for the king, and most strictly against the grantee;' but grants obtained as matter of special favor of the king, or on consideration, are more liberally construed;' and to the same effect are the observations of Story, J., at page 589, where he says the rule never did apply to grants made by the sovereign for a valuable consideration. In 3 Washburn on Real Property (3d ed.), 172, the learned author says: ' This strictness of construction in favor of the sovereign and against the subject applies only in cases where there is a real uncertainty or ambiguity in the terms of the grant. Nor, as it seems, is the rule applicable where the grant is for a valuable consideration. In such case the rule of construction between the government and the subject is the same as between private grantors and grantees.' "

We contend that this release by the state of all its interest in all of the property in question in the settlement of an ejectment action where the defendant makes claim to all the property, is to be distinguished from the ordinary grant by the state of public land on the ocean or on a river where the tide ebbs and flows. In such cases, it is true where the language of the grant is to the river or the ocean it extends only to high-water mark.

But this is a case where the state ceases from its efforts to oust a person claiming the property to low-water mark, and releases all its claim in such property for a valuable consideration. There can be no question in our minds under such circumstances that the state did and intended to withdraw all its claims to the property in controversy.

And in view of the above authorities, there can seem to be no doubt about it. It will be observed that Judge Story said that the rule which the state and the city invoke here " never did apply to grants made by the sovereign for a valuable consideration."

We must conclude, therefore, that Henry Y. Attrill became vested in 1887 with the title of the westerly end of Rockaway point from a line east of the easterly line of the appropriation in question in fee simple and to mean low-water.

The second question upon which the final decision as to the title and ownership of at least a part of the appropriated parcel depends, is whether the growth of Rockaway point to the westward since 1887 has been by the gradual process of accretion or whether it has been by avulsion and the annexation of islands.

The city and the state contend that its growth since 1887 has been by the latter method. They contend that what was known as the " East Way " channel of Rockaway inlet in 1887 was about in the same relative position as the center of the appropriated parcel from east to west; that said " East Way " filled up with sand and connected the westerly point of Rockaway peninsula with Duck Bar island; that Duck Bar island belonged to the state and that, therefore, claimant's title ends and the state's title commences on the line where the westerly end of the point thereby became attached to said island; and that from such point westward all of the peninsula belongs to the state.

We believe that the overwhelming preponderance of evidence in this case is against such contention.

We are firmly impressed not only by the witnesses who testified on that subject, but also by the vast amount of documentary evidence introduced, including maps and charts of all kinds, that for a considerable period of time before the state released its claim, the growth of Rockaway peninsula to the west had been by the continual and gradual process of accretion.

This is by no means the first time that a court has reached this conclusion. In the case of *Van Deventer* v. *Lott*, 172 Fed. Rep. 574, the same question of fact was at issue. Judge Chatfield, who heard that case, commented on the westward growth of Rockaway peninsula as follows:

" The case involves the decision of a difficult question of fact, in that it must be determined whether the movement of the inlet was such that all of the land added to Rockaway Point or connected with it from time to time toward the west has been raised up out of the ocean and established above high-water mark by what is known as the gradual process of accretion." **P. 577.**

33

" Since 1878 and 1879 the growth of Rockaway Beach to the westward seems to have been gradual. The present western extremity of the beach is almost due south of Plumb Island, and reaching nearly to the longitude of the eastern extremity of Coney Island as it now exists. The character of the beach itself and the various United States Charts show that during this latter period the growth has been what can properly be called accretion." P. 581.

This case was decided in July, 1909. It was an action brought by Andrew K. Van Deventer, one of claimant's grantors, to quiet his title against one Lott who derived his title from grantors who had been in possession and ownership of the southern portion of Barren island. Judge Chatfield concluded his opinion, at page 592, with this language: " Upon the whole case, therefore, it must be held that the complainant has shown title to the property involved, and should have a decree against all the defendants."

Therefore, the validity of this claimant's title was established in 1909 by a judgment of the Circuit Court of the United States. Lott not beng satisfied with this disposition of the case appealed to the Circuit Court of Appeals, Second Circuit, held by Judges Lacombe, Coxe and Noyes, and in 1910 they affirmed the judgment of the Circuit Court, Judge Coxe writing the opinion, reported in 180 Federal Reporter at page 378. In his opinion, among other things, Judge Coxe says:

" The complainant shows title to the property described in the various conveyances, the earliest dating from 1685. On February 11, 1901, he received the deed executed by Arabella D. Huntington, widow of Collis P. Huntington, and Henry E. Huntington, holding under the last will and testament of the said Collis P. Huntington. Complainant's record title to the lands described in the various conveyances cannot be questioned. (P. 379) * * * we are thoroughly convinced that the following facts are established:

" *First.* * * * that complainant's predecessors owned Rockaway Point.

" *Second.* From 1685 to the date of the trial Rockaway Point has been gradually and imperceptibly working to the west and south. This has been by accretion and not by avulsion, but the defendants' access to the sea by a navigable channel has never been cut off."

When the state of New York relinquished to Henry Y. Attrill in 1887 " *All* right, title, and interest, claim and demand in and to *all* that point and peninsula of land known as Rockaway Beach," it did it in language so specific and inclusive that it is impossible to find therein any reservation of any shred of title left in the

state. And this is made even more emphatic in view of the fact that this act of the legislature was passed to carry out the agreement made by the state with Attrill to settle the ejectment action wherein Attrill was claiming title to this property to mean low water under a long record title. Especially is this so in view of the holding in *Langdon* v. *Mayor, supra,* that in such grants from the sovereign as the one before us, made for a valuable consideration, the grant is to be construed favorably to the grantee and against the grantor.

There could be no break, therefore, in the chain of title from Attrill to the Rockaway Pacific Corporation, unless since 1887 the westerly end of Rockaway peninsula has annexed some islands in a different ownership. That such has not been the case, we think, is clearly established by the evidence herein as before stated.

This question of the growth westward of Rockaway peninsula was examined with great care in the Circuit Court of the United States and in the Circuit Court of Appeals of the United States as has already been referred to. It is significant that every court that has examined that proposition has reached the same conclusion.

We conclude, therefore;

*First,* that the state of New York by chapter 560 of the Laws of 1887 intended to and did release unto Henry Y. Attrill all and every interest, right, title, claim and demand in the lands at the westerly end of Rockaway peninsula here in controversy, not only to the high-water line, but also to the line of mean low water of the Atlantic ocean, Rockaway inlet and Jamaica bay;

*Second,* that since the release to Henry Y. Attrill, aforesaid, the growth of Rockaway point to the westerly has not been by avulsion, not by the annexation of islands, but by the continual and gradual process of accretion; and that the ownership of the said Henry Y. Attrill and his successor in title extended westerly with the point as it thus advanced;

*Third,* that at the date of the appropriation by the state on April 4, 1917, the claimant herein, known as the Rockaway Pacific Corporation, was the owner in fee simple to the line of mean low water of all the property taken by the state, being all of the appropriated property except five and five-tenths acres below the line of mean low water, title to which at that time was vested in the city of New York.

We come now, therefore, to the question of damages. After a careful consideration of all the testimony submitted to us on that subject, as well as the briefs and argument of counsel, we reach the conclusion that the real estate of the Rockaway Pacific Corporation at the westerly end of the Rockaway peninsula immediately

prior to the appropriation by the state in question was of the fair and reasonable market value of $2,837,250; that immediately after said appropriation said property was of the fair and reasonable market value of $1,570,800.

That the damages, therefore, suffered by said Rockaway Pacific Corporation because of the appropriation of its said property by the state amount to $1,266,450. We find further that the fair and reasonable market value of the five and five-tenths acres of land below mean low water owned by the city of New York included in said appropriated parcel is the sum of $3,000. We have, therefore, made an award to the city of New York and to the Rockaway Pacific Corporation for the respective amounts above mentioned, together with interest from April 4, 1917.

· CORWIN, J., concurs.

Judgment accordingly.